**KEENER OIL & GAS CO. v. CONSOLIDATED GAS UTILITIES CORP.**

No. 4241.

United States Court of Appeals Tenth Circuit.

Aug. 1, 1951.

Rehearing Denied Aug. 24, 1951.

Richard H. Wills, Jr., and J. C. Pinkerton, Tulsa, Okl., for appellant.

Conrad C. Mount and Coleman Hayes, Oklahoma City, Okl., for appellee.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

Consolidated Gas Utilities Corporation[1] brought this action against The Keener Oil & Gas Co.[2] seeking a declaratory judgment adjudicating the respective rights and obligations of Consolidated and Keener under a contract dated April 9, 1929.[3] The contract was entered into between the Consolidated Gas Utilities Co. and the Bartlett Gasoline Co. Consolidated is the successor of the former and Keener is the successor of the latter. Since prior to April 9, 1929, Consolidated and its predecessor have been public utility companies engaged in the production and transportation of gas and the sale thereof for industrial and domestic uses in many communities in Oklahoma and Kansas. Consolidated now furnishes gas from the Elk City Field, transported through its 14-inch line and its connecting line to such field, to 51 cities and towns in Oklahoma and Kansas having an aggregate population of 244,681. Prior to April 9, 1929, Consolidated's predecessor had acquired producing gas wells in the East Panhandle Gas Field, in Wheeler County, Texas. In 1928, Consolidated's predecessor constructed a 14-inch pipeline from its gas wells in the East Panhandle Field to Enid, Oklahoma. Connecting lines of Consolidated extend from Enid through Blackwell, Oklahoma, and Wichita, Kansas, to Lyons, Kansas.

The gas produced in the East Panhandle Field was wet gas. It was desirable to have the gas processed so as to remove the natural gasoline therefrom and convert the wet gas into dry gas.

In the contract, Consolidated's predecessor was referred to as the first party and Keener's predecessor was referred to as the second party.

The pertinent provisions of the contract read as follows:

"(4) * * * It is definitely agreed that this contract shall apply only to the 14" line now owned and operated by First Party, it being understood, however, that First Party shall not construct any other lines which will by reason thereof decrease the average delivery of gas through said 14" line to less than fifteen million feet per twenty-four hours, * * *.[4]

1. Hereinafter called Consolidated.

2. Hereinafter called Keener.

3. Hereinafter referred to as "the contract."

4. By an amended agreement, entered into on May 1, 1941, the provision in paragraph (4) with respect to the construction of other lines by Consolidated was limited to "lines to the Texas Panhan-

"(5) That first party has granted, and by these presents does hereby grant to second party, the right to construct, maintain and operate a drying plant or gasoline plant in connection with and at a point along said first party's pipeline system, * * *.

* * * * * *

"(7) That first party shall * * * permit the flow of gas passing through its pipeline system to be diverted through the plant of second party so that second party may dry the gas handled by first party, and extract therefrom the gasoline contained and found therein; provided, however, that after the extraction of said gasoline from said gas in second party's plant, second party shall return said gas to first party's pipeline system for its further transportation and distribution to its customers and consumers, * * *.

"(8) That first party reserves, and shall at all times have, the exclusive right of regulating and controlling the volume and pressure of gas in its pipeline system, and the flow of gas through the same, and said volume, pressure and flow may fluctuate or be changed from time to time; * * *.

* * * * * *

"(15) That first party shall not during the life of this contract construct or install any gasoline plant or other device except standard drips for the extraction of gasoline at any point before or ahead of the flow of gas through second party's plant as herein provided for, nor allow anybody else to do so, except second party herein. * * *.

* * * * * *

"(26) That this contract shall remain in full force and effect for a period of ten years, and as long thereafter as said pipeline system is continued in use for transporting gas having a gasoline content, * * *."

Keener's predecessor constructed a gasoline plant near Butler, Oklahoma, approximately 70 miles east of the East Panhandle Gas Field" and Keener's predecessor was given the right to extract butane and

handle Field terminus of the 14-inch pipeline.

In 1929, Consolidated's predecessor owned 11 producing wells in the East Panhandle Field. At that time the average rock pressure in the field was more than 370 pounds and the average open flow per well was over 36,000 M. C. F. per day. In 1950 it was 1500 M. C. F. per day. A reputable geologist, prior to the date of the contract, had estimated the gas reserves underlying the leases of Consolidated's predecessor to be 94.9 billion cubic feet. The estimate was based on the assumption that a well would be abandoned when the pressure decreased to 50 pounds. Keener's predecessor was apprised of such estimate prior to the time it constructed the gasoline plant. Prior to January 1, 1950, there was processed through such plant 166 billion cubic feet. The large amount of gas produced in excess of the estimate resulted from the acquisition by Consolidated of 49 additional wells, and the fact that Consolidated was able to produce its wells down to an average pressure of 38 pounds by subjecting the gas to a three-step compression before it entered the 14-inch line.

By 1949, it became apparent that Consolidated's source of gas supply in the East Panhandle Field would be depleted in the near future. It had exhausted the possibilities of acquiring additional production in the East Panhandle Field. The pressure decline of Consolidated's wells in the East Panhandle Field between 1949 and 1950 was 30.44 per cent. When the pressure in a well declines to 25 pounds, water encroachment ordinarily prevents further production therefrom. The 14-inch line has a capacity of approximately 39,000 M. C. F. per day. On peak requirement days it needs that amount of gas for the customers presently supplied from the 14-inch line. The maximum amount of gas which it will be able to obtain from the wells in the East Panhandle Field on future peak days in 1950–1951 will be propane from the gas which it processed under the contract.

17,000 M. C. F., in 1951–1952 10,000 M. C. F., and in 1952–1953 none.

In view of the approaching depletion of its reserves in the East Panhandle Field. Consolidated began, as early as 1944, to look for a new source of supply.

In November, 1947, Shell Oil Company[5] discovered what is known as the Elk City Oil and Gas Field, located in Beckham and Washita Counties, Oklahoma, approximately 14 miles south of the 14-inch line and south and west of Keener's gasoline plant. The gas pool underlying that field is a separate and distinct geological formation from the producing area in the East Panhandle Field. Shortly after the discovery of the Elk City Field, Consolidated began negotiating with Shell and other producers for the purchase of gas in the Elk City Field. Shell was the dominant producer in that field. During the negotiations Shell disclosed to Consolidated that Shell intended to construct a gasoline extraction plant in the Elk City Field and as soon as the plant was put into operation, only dry gas, which had been stripped of its natural gasoline, pentane, butane and propane content, would be available in the Elk City Field and that any contract for the purchase of gas from Shell must reserve to it the right to process the gas through its gasoline plant. Other producers refused to sell wet gas to Consolidated because of their knowledge of Shell's plans to construct a gasoline plant through which they could process their gas, using a portion of the residue gas for reinjection to maintain pressure. Consolidated took up with Keener the question of whether the purchase by Consolidated of processed gas from Shell and the transmission thereof through the 14-inch line would constitute a violation of the contract. Keener contended, and has continuously since contended, that the transmission by Consolidated of processed gas purchased from Shell, through the 14-inch line would constitute a breach of the contract.

On August 6, 1949, Consolidated and Keener entered into a so-called no-prejudice agreement. It recited that Consolidated was negotiating an agreement to purchase gas produced in the Elk City Field from Shell; that Shell was insisting that the purchase contract contain a provision giving Shell the right to strip the gas to be delivered thereunder of its natural gasoline, pentane, butane and propane content; that such purchase contract was to expire March 31, 1952; and that Consolidated and Keener were in dispute as to whether the contract, as amended, would embrace gas produced in the Elk City Field. The no-prejudice agreement provided that if, under the provisions of the proposed purchase contract, to expire March 31, 1952, Shell should extract such content, Consolidated should not be considered by reason thereof to have breached the contract, but that the no-prejudice agreement and the delivery of gas under the purchase agreement in the 14-inch line should not be considered as settling such dispute and should be without prejudice, either to the rights of Consolidated or Keener, under the contract, and that the no-prejudice agreement should expire March 31, 1952.

Shell was unwilling to enter into a long-term gas purchase contract with Consolidated unless Consolidated could obtain an agreement with Keener that the transmission of processed gas purchased from Shell through the 14-inch line would not constitute a breach of the contract, or an adjudication that it would not constitute such a breach.

On August 10, 1949, Consolidated and Shell entered into a gas purchase agreement, to expire March 31, 1952. It recited the dispute between Consolidated and Keener, the no-prejudice agreement, and that it was contemplated that Consolidated and Shell would enter into a long-term gas purchase agreement, provided Consolidated was successful in obtaining on or before September 1, 1951, either an agreement with Keener or an adjudication that the transmission of processed gas purchased from Shell in the 14-inch line would not constitute a breach of the contract.

5. Hereinafter called Shell.

In order to induce Shell to enter into a gas purchase agreement with Consolidated, the latter had to satisfy Shell it could transport to market through its 14-inch line approximately 80,000 M. C. F. of gas per day. Consolidated could only meet that requirement by transporting through its 14-inch line approximately 40,000 M. C. F. of gas northward and approximately the same quantity southward.

On November 11, 1949, Consolidated completed the construction of a gas pipeline from the Elk City Field to its 14-inch line, a distance of approximately 14 miles, including a dehydration plant and other facilities, and such facilities are now being used to transport gas from the Elk City Field to Consolidated's 14-inch line.

On December 12, 1949, Consolidated entered into an agreement with United Gas Pipeline Company,[6] whereby Consolidated agreed to transport certain gas controlled by United from the Elk City Field to the East Panhandle Field and to sell to United surplus Elk City Field gas which Consolidated might have, up to a maximum of 10,000 M. C. F. per day, and to transport such gas to the East Panhandle Field. Consolidated reserved the right to substitute for Elk City gas to be delivered to United under the contract, gas produced by Consolidated in the East Panhandle Field. The agreement provided that it would expire March 31, 1952.

At the time of the trial below, November, 1950, Shell had commenced the construction of a gasoline plant in its Elk City Field capable of processing 100,000 M. C. F. of gas per day, and it was contemplated that the plant would be completed and put into operation not later than January, 1951.

The trial court denied a motion interposed by Keener to dismiss the action upon the ground the complaint failed to state a claim upon which relief could be granted.

From a judgment adjudicating, in effect, that neither a failure by Consolidated to continue to transport its diminishing residue of gas in the East Panhandle Field through its 14-inch line, nor the transportation by Consolidated through its 14-inch line of Elk City Field gas which had been stripped of its natural gasoline, pentane, butane and propane content, would constitute a violation of the contract, Keener has appealed.

■ There existed an actual and continuing controversy between Keener and Consolidated as to whether the transportation by Consolidated, through its 14-inch line, of gas from the Elk City Field, purchased by it from Shell and from which Shell had extracted natural gasoline, pentane, butane and propane, would constitute a violation of the contract. The fact such transportation would not constitute a breach of the contract until the expiration of the no-prejudice agreement did not prevent the dispute from being a real, substantial, and existing controversy. In such a situation, a party to a contract is not compelled to wait until he has committed an act which the other party asserts will constitute a breach, but may seek relief by declaratory judgment and have the controversy adjudicated in order that he may avoid the risk of damages or other untoward consequence.[7]

The test is whether the facts presented show that "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.[8]"

■ We conclude that there was an actual controversy, ripe and appropriate for judicial determination, and that the denial of Keener's motion to dismiss the action was proper.

The contract was to remain in force for

---

6. Hereinafter called United.

7. See Delaney v. Carter Oil Co., 10 Cir., 174 F.2d 314, 317, where we said: "One of the highest offices of declaratory procedure is to remove uncertainty and insecurity from legal relations, and thus clarify, quiet and stabilize them before irretrievable acts have been undertaken."
   See, also, American Machine & Metals, Inc. v. DeBothezat Impeller Co., Inc., 2 Cir., 166 F.2d 535, 536, 537.

8. Maryland Casualty Co. v. Pacific Coal & Oil Co. et al., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826.

a primary term of 10 years, and as long thereafter as the 14-inch line should be used for the transmission of gas having a natural gasoline content. After the expiration of the primary term, Consolidated, acting in good faith[9] and under circumstances that made it reasonable so to do, had the right to cease to use such line for the transmission of gas having a natural gasoline content and to transport therein gas stripped before its transmission of its natural gasoline, propane and butane content.

■ We think the obligation to act in good faith required Consolidated to deliver gas produced by it from its wells in the East Panhandle Field to Keener's plant for extraction of its gasoline, butane and propane content after the expiration of the 10-year period, so long as the wells of Consolidated in the East Panhandle Field produced gas in sufficient quantities to meet Consolidated's requirements. But the parties must have contemplated that the supply of gas in the East Panhandle Field would some day become exhausted and that Consolidated would have to look elsewhere for a supply of gas to fill its requirements. Obviously, Consolidated was not obligated to wait until the supply of gas in the East Panhandle Field was exhausted, before seeking a new source of supply. When it was manifest that the supply of gas in the East Panhandle Field was approaching the exhaustion point, Consolidated clearly had the right to act providently and to provide, through purchase contracts or otherwise, for a new supply of gas to meet its requirements.

The question of whether the contract embraced gas containing natural gasoline, propane and butane obtained by Consolidated from an entirely new and separate source of supply and transmitted through the 14-inch line is not presented and need not be determined; the primary term of the contract had expired; Consolidated was unable to obtain gas from the Elk City Field from which the natural gasoline, propane and butane content had not been re-moved; and since January, 1951, Shell has extracted such content from the gas furnished by it to Consolidated, and Consolidated has not used its 14-inch line for the transportation of gas having a natural gasoline, propane or butane content.

■ It was imperative in 1949 that Consolidated make provision for a new source of gas supply to meet its requirements and enable it to continue to serve its gas customers. As a condition to supplying Consolidated with such gas, Shell insisted that it have the right to remove from the gas, before delivering it to Consolidated, the natural gasoline, pentane, butane and propane content thereof. Under the circumstances, bad faith cannot be imputed to Consolidated for agreeing to purchase such gas under the terms insisted on by Shell.

The only question remaining is whether Consolidated is obligated to continue to transport the diminishing residue of gas from its wells in the East Panhandle Field to Keener for processing until such supply of gas is completely exhausted. So to do would be an uneconomical utilization of that part of Consolidated's 14-inch line extending from Keener's plant to Consolidated's wells in the East Panhandle Field. We are of the opinion that when Consolidated was compelled to obtain a new source to supply its gas requirements, it had the right, under the facts and circumstances here presented, to discontinue the use of its 14-inch line to transport gas from the East Panhandle Field, and to make an economical disposition of the diminishing residue of gas from its wells in the East Panhandle Field, which were rapidly approaching the point of complete exhaustion. It should be noted that in making such disposition Consolidated did not construct any lines to the East Panhandle Field which would decrease the delivery of gas from that field through its 14-inch line.

Moreover, Consolidated had to satisfy Shell that Consolidated could transport and market approximately 80,000 M. C. F. of

---

9. See Southwest Natural Gas Co. v. Oklahoma Portland Cement Co., 10 Cir., 102 F.2d 630, 632, 633.

gas per day, before Shell was willing to contract to furnish gas to Consolidated. The diminishing supply of gas in the East Panhandle Field created a market there for gas from the Elk City Field. Consolidated could only meet Shell's requirements by transporting approximately 40,000 M. C. F. of gas northward and approximately 40,000 M. C. F. of gas southward through its 14-inch line from the point where its line from the Elk City Field connected with its 14-inch line.

We conclude that since the primary term of the contract had expired, and Consolidated, acting in good faith and under facts and circumstances which made it reasonable so to do, ceased to use its 14-inch line for the transportation of gas having a gasoline content, that the contract has expired; and that the transmission by Consolidated, through its 14-inch line, of gas from the Elk City Field, purchased by Consolidated from Shell, and from which Shell has removed the natural gasoline, pentane, butane and propane content, does not constitute a violation of the contract.

The judgment is affirmed.