**GILBERT, SEGALL AND YOUNG, Plaintiff,**

v.

**BANK OF MONTREAL, Defendant.**

**No. 91 Civ. 3724 (SWK).**

United States District Court,
S.D. New York.

March 6, 1992.

Gilbert, Segall and Young by Jeffrey E. Livingston, Robert N. Rothberg, Arthur G. Larkin, pro se.

Sullivan & Cromwell, by John L. Hardiman, David B. Kaplin, Penny Shane, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff Gilbert, Segall and Young ("GSY") instituted this action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 for the purpose of determining its liability under a lease of commercial office space if it vacates the premises prior to the expiration of the term of the lease and makes no future rental payments to defendant Bank of Montreal (the "Bank"). The Bank moves to dismiss GSY's complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(c), on the ground that this Court lacks subject matter jurisdiction. The Bank argues that the instant action does not present an "actual controversy" between the parties as required under § 2201, and therefore is not within the jurisdiction of this Court. GSY opposes the Bank's motion to dismiss, and pursuant to an order of the Court dated November 26, 1991, cross-moves for an order, under Federal Rule of Civil Procedure 15(a), granting GSY leave to serve an amended complaint. For the reasons set forth below, the Bank's motion to dismiss is denied, and GSY's motion for leave to amend its complaint is granted.

## BACKGROUND [1]

According to the original complaint, on or about June 3, 1975, GSY and the Bank's predecessor in interest, Colt Industries Inc. ("Colt"), entered into an Agreement of Lease (the "Lease") whereby GSY leased space in 430 Park Avenue for a term of ten years and eight days, from October 23, 1975 through October 31, 1985, for a fixed rent of $149,225 per year. Complaint, at ¶ 6. Article 52 of the Lease initially provided, in relevant part, as follows:

> Tenant's liability under this lease shall be limited as follows: $500,000 from the date hereof and during the first lease year, $450,000 during the second lease year, $400,000 during the third lease year, $350,000 during the fourth lease year, $300,000 during the fifth lease year and $250,000 from and during the sixth lease year until the termination of Tenant's obligations under this lease. The limitations on Tenant's liability set forth in this Article shall not apply to any damage or loss for which Tenant is liable under the lease and (i) for which casualty and/or public liability and property damage insurance is obtainable by or available to Tenant through standard policies or (ii) which is caused by the gross negligence or wilful misconduct of Tenant.

Complaint, at ¶ 7.

On or about January 28, 1977, during the second lease year, GSY and Colt entered into an Amendment of Lease Agreement (the "First Amendment") which, among other things, expanded the amount of space subject to the Lease, increased the fixed rent to $231,301 per year effective March 1, 1977, and amended Article 52 to provide, in pertinent part, as follows:

> Tenant's liability in the event of any default under this lease shall be limited as follows: $500,000 [2] from the date hereof and during the first lease year, $684,000 during the second lease year, $608,000

during the third lease year, $532,000 during the fourth lease year, $456,000 during the fifth lease year and $380,000 from and during the sixth lease year until the termination of Tenant's obligations under this lease. The limitations on Tenant's liability set forth in this Article shall not apply to any damage or loss for which Tenant is liable under the lease and (i) for which casualty and/or public liability and property damage insurance is obtainable by or available to Tenant through standard policies or (ii) which is caused by the gross negligence or wilful misconduct of Tenant.

Complaint, at ¶ 8.

In or about February 1981, the Bank succeeded to Colt's interests as landlord under the Lease, and on or about November 2, 1984, GSY and the Bank entered into a Second Amendment of Lease Agreement (the "Second Amendment"). The Second Amendment, among other things, extended the Lease to October 31, 1990 and increased the fixed rent to $975,000 per year effective November 1, 1985. Complaint, at ¶ 10. The Second Amendment did not amend Article 52. In fact, paragraph 9 of the Second Amendment stated as follows:

> The parties agree that the Lease, as hereby amended, is and shall remain in full force and effect.

On or about September 1, 1986, GSY and the Bank entered into a Third Amendment of Lease Agreement (the "Third Amendment") which, among other things, expanded the amount of space subject to the Lease, extended the term of the Lease to October 31, 1996, and increased the fixed rent to $1,339,850 per year effective November 1, 1986, and to $1,593,850 per year effective November 1, 1991. Complaint, at ¶ 12. The Third Amendment did not effect Article 52, but rather provided in ¶ 12 as follows:

---

1. The facts set forth are those alleged in GSY's original complaint.

2. Since the first lease year had expired as of the date of the First Amendment, there was no need to amend the limitation amount applicable dur-

ing the first lease year ($500,000). Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion For Judgment On The Pleadings ("Pl. Opp. Mem."), at 5 n. 1.

The parties agree that the Lease, as hereby amended, is and shall remain in full force and effect.

Complaint, at ¶ 13.

GSY alleges that because of the decline in the value of commercial office space in Manhattan, the rentals provided in the Lease have become excessive in relation to the market for such space. Complaint, at ¶ 16. GSY also claims that Article 52 specifically provides that if GSY ever defaults under the Lease by vacating the premises and ceasing to make further rental payments to the Bank, its liability would be limited to $380,000. Complaint, at ¶ 14. As such, before the $254,000 per annum increase took effect on November 1, 1991, GSY advised the Bank that:

[it] is *considering vacating* the Premises prior to the expiration of the term of the Lease, making no further rental payments to the Bank after such vacation of the Premises, and after such default, paying the Bank no more than $380,000, as provided under Article 52 for any default.

Complaint, at ¶ 17.

The Bank disagrees with GSY's interpretation of Article 52 of the Lease. It is the Bank's position that Article 52 will not limit GSY's liability to $380,000 if it vacates the premises prior to the expiration of the term of the Lease and makes no further rental payments to the Bank. Rather, according to the Bank, GSY's liability to the Bank will amount "to no less than approximately $8,000,000 minus whatever rental payment the Bank may obtain from a successor tenant of the premises for the balance of the term of the Lease." Complaint, at ¶ 18.

GSY and the Bank conducted discussions concerning GSY's liabilities under the Lease, but were "completely unable to reconcile their different interpretations regarding the applicability and legal effect of Article 52." Complaint, at ¶ 19. Thus, GSY seeks a judicial declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that its liability to the Bank will be limited to a maximum of $380,000 if GSY defaults and makes no further rental payments to the Bank.

GSY maintains that the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that the matter in controversy exceeds the sum of $50,000 exclusive of interest and costs, and is between a citizen of two states and a citizen of a foreign state. GSY also claims that the dispute as to GSY's maximum liability for default under the Lease is an "actual controversy" within the jurisdiction of this Court as required by 28 U.S.C. § 2201, and may be determined by a judgment of this Court.

The Bank moves to dismiss GSY's complaint pursuant to Rule 12(b)(1) and 12(c) on the ground that it does not present an "actual controversy" within the jurisdiction of this Court. Since GSY alleges only that it is *considering* walking out on the Lease before it expires without making further rental payments, the Bank contends that GSY's request for a declaratory judgment is a classic request for an advisory opinion, which the Court is not empowered to render because the Constitution limits the jurisdiction of the federal courts to "cases and controversies." Defendant's Memorandum In Support Of Its Motion For Judgment On The Pleadings ("Def. Mem. in Support"), at 1–2. GSY opposes the Bank's motion to dismiss and, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, has filed a cross-motion for leave to amend its complaint, together with a proposed amended complaint, on the ground that there are additional allegations relevant to the existence of an "actual controversy" that should be before the Court.

Comparison of the complaint and the proposed amended complaint indicates that the amended complaint primarily seeks to expand and clarify the allegations set forth in the original complaint so that the Court can more easily find the existence of an "actual controversy." For example, the proposed complaint details the efforts GSY made to find new office space, Proposed Amended Complaint, at ¶ 19, 20, 30, 32, and the unsuccessful negotiations between the Bank and GSY concerning a possible rent reduction. Proposed Amended Complaint, at ¶¶ 20–31. It also sets out more completely

the parties' disagreement over the effect of Article 52 of the Lease. Proposed Amended Complaint, at ¶¶ 21, 22, 24, 25, 26, 31, 35, 36.

The proposed amended complaint, however, does contain three significant changes. First, the proposed complaint has new language about GSY's intentions with respect to vacating the premises. In the original complaint, GSY asserted that it was *"considering vacating"* the premises prior to the expiration of the term of the Lease, making no further rental payments to the Bank ... and after such default, paying the Bank no more than $380,000 ...," Complaint, at ¶ 17, whereas in its proposed pleading, GSY avers that at a meeting of the partnership on October 8, 1991, GSY adopted the following resolution as reflecting the desires and intentions of the firm in regard to the Lease:

"it is the *desire* of the firm to vacate the premises at 430 Park Avenue and cease to pay further rent with respect thereto, and, thereupon to occupy new office space at another location under a new lease reflecting current market conditions; and it is the *intention* of the firm to take the aforementioned steps upon receiving a judgment declaring that its liability ... would be limited to $380,-000." Proposed Amended Complaint, at ¶ 34.

Second, the proposed amended complaint more specifically alleges that the Bank and its attorneys, Sullivan & Cromwell, have led GSY to believe that in the event GSY vacates the premises and ceases to pay further rent under the Lease, the Bank will sue GSY for the maximum amount of damages permitted by law in the absence of Article 52. Proposed Amended Complaint, at ¶¶ 32, 38, 39. According to GSY, such damages could be as much as approximately 8 million dollars. Proposed Amended Complaint, at ¶¶ 38, 39.

Third, the proposed amended complaint details GSY's inability to vacate the premises and enter a new lease without first obtaining a judgment as to the effect of Article 52. Proposed Amended Complaint, at ¶¶ 41–44.

## DISCUSSION

### I. Motion to Amend the Complaint

Rule 15(a) of the Federal Rules of Civil Procedure allows a party to amend the complaint with leave of the court and provides that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the leading case on this subject, the Supreme Court ruled that this rule shall be construed liberally. The grant or denial of a request to amend, however, is within the discretion of the district court, and there are a number of bases upon which a court may deny a motion to amend. *Id.* at 182, 83 S.Ct. at 230; *see also, Tri–State Judicial Services, Inc. v. Markowitz,* 624 F.Supp. 925, 926 (E.D.N.Y.1985). Specifically, a trial court, in its discretion, may deny leave to amend where there exists undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. *Foman v. Davis,* 371 U.S. at 182, 83 S.Ct. at 230. In this Circuit, it is well settled that an amendment is considered futile if the amended pleading fails to state a claim, *Tri–State Judicial Services, Inc.,* 624 F.Supp. at 926 (citing *S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979); *Freeman v. Marine Midland Bank–New York,* 494 F.2d 1334, 1338 (2d Cir.1974); *Johnson v. Partrederiet Brovigtank,* 202 F.Supp. 859 (S.D.N.Y. 1962)), or would be subject to a motion to dismiss on some other basis. *See, e.g., De Luca v. Atlantic Refining Co.,* 176 F.2d 421, 424 (2d Cir.1949), *cert. denied,* 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (statute of limitations).

In this case, the Bank argues that the Court should deny GSY's motion for leave to amend the complaint because the amended complaint would be futile; namely, it would not survive a motion to dismiss pursuant to Rule 12(b)(1) or Rule 12(c). Specifically, the Bank contends that amend-

ment would be futile because the "new" allegations of the proposed complaint still do not allege a case or controversy as required by Article III of the Constitution. The Court disagrees, and for the reasons set forth below, finds that GSY's proposed complaint adequately alleges a justiciable controversy.

### A. Requirement of an "Actual Controversy"

■ Article III, § 2 of the United States Constitution limits the subject matter jurisdiction of federal courts to "cases and controversies." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1936). The Declaratory Judgment Act provides that the remedy of declaratory judgments is available only in cases "of actual controversy." It is well settled that this limitation to cases "of actual controversy" is the same as the "case or controversy" requirement. *Aetna Life Ins. Co.*, 300 U.S. at 239–40, 57 S.Ct. at 463–64. As Chief Justice Hughes stated in *Aetna Life:*

> The Declaratory Judgment Act of 1934, in its limitation to "cases of actual controversy," manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense. The word "actual" is one of emphasis rather than one of definition.

300 U.S. at 239–240, 57 S.Ct. at 463. Accordingly, the Declaratory Judgment Act "does not impose a higher threshold for justiciability than the basic Article III requirement that federal courts shall only decide cases or controversies." *East/West Venture v. Wurmfeld Associates, P.C.*, 722 F.Supp. 1064, 1067 (S.D.N.Y.1989) (citing *Aetna Life Ins. Co.*, 300 U.S. at 239–40, 57 S.Ct. at 463–64).

Having determined that the Declaratory Judgment Act does not require a more stringent showing of justiciability than the Constitution, it is necessary to determine what constitutes "an actual controversy," for, as stated above, the District Court is without power to grant declaratory relief unless such a controversy exists.

First, it must be noted that "the difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Thus, the distinction between hypothetical questions and tangible controversies is "one of degree to be determined on a case by case basis." *Airship Industries, Ltd. v. Goodyear Tire & Rubber Co.*, 643 F.Supp. 754, 758 (S.D.N.Y.1986) (citing *Nippon Electric Glass Co. v. Sheldon*, 489 F.Supp. 119, 121 (S.D.N.Y.1980)).

Although it has been extremely difficult to articulate a convenient and precise standard, the Supreme Court has provided guidance as to what constitutes an "actual controversy" for purposes of the Declaratory Judgment Act. In *Aetna Life Ins. Co.*, the Court stated that:

> A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests (citations omitted). It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts (citations omitted). Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties, ... the judicial function may be appropriately exercised
> ...

*Aetna Life Ins. Co.*, 300 U.S. at 240–41, 57 S.Ct. at 464. Further, the Supreme Court has indicated that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.*, 312 U.S. at 273, 61 S.Ct. at 512; *see, Beacon Construction Co. v. Matco Electric Co.*, 521 F.2d 392, 397 (2d Cir.1975); *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir.1991), *cert. denied,* —— U.S. ——, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991).

■ It is thus clear that an active and genuine dispute between the parties, whatever its heat, does not necessarily amount to a case or controversy, and the requirements of justiciability are not met if the complainant merely alleges that he does not know what course to pursue. *M & M Transp. Co. v. U.S. Industries, Inc.,* 416 F.Supp. 865, 870–71 (S.D.N.Y.1976) (citing *Duart Mfg. Co. v. Philad Co.,* 30 F.Supp. 777 (D.Del.1939)).

**B.** *Existence of an "Actual Controversy"*

■ As stated above, the Bank contends that even if the Court granted GSY leave to amend, the proposed complaint would be dismissed, pursuant to Rule 12(b)(1) or 12(c), on the ground that GSY has still failed to allege an "actual controversy." According to the Bank, the proposed amended complaint does not allege any new facts that have ripened the controversy as GSY has still not abandoned the Premises or made any concrete plans to leave; rather, the new complaint has only new language. GSY has replaced its "considering vacating" verbiage with a statement that it "desires and intends" to vacate the Premises. Defendant's Memorandum in Opposition to Plaintiff's Motion For Leave to Amend the Complaint ("Def. Opp. Mem."), at 1–2. As such, the Bank contends that amendment of the complaint would be futile, and GSY's motion for leave to amend should be denied. The Court disagrees. The proposed amended complaint sufficiently alleges an "actual controversy" within the purview of Article III of the Constitution, and thus GSY's motion for leave to amend is granted.

**1. Supporting Authority**

*American Machine & Metals, Inc. v. De Bothezat Impeller Co.,* 166 F.2d 535 (2d Cir.1948) ("De Bothezat"), a 1948 Second Circuit case which is closely analogous to the case at bar, is strong authority for the Court's conclusion that an "actual controversy" exists in the present case. In *De Bothezat,* the parties entered into a contract under which the defendant conveyed to the plaintiff certain patents and physical equipment for the making of fans and other products, and the plaintiff agreed to pay the defendant license fees (not less than $5,000 annually) based on the "net sales" of its products. *Id.* at 535. The contract contained no expiration date, but provided that the contract could be terminated at any time by the plaintiff on six months notice. *Id.* at 535. In the event of such termination the plaintiff was to transfer the patents back to the defendant and stop using the name "De Bothezat," which it had agreed to use in its literature and promotional activity while the contract continued. *Id.* at 535. The contract was profitable for the plaintiff for over ten years, but eventually the plaintiff neither manufactured nor sold any product for which possession of the patents was essential. Thereafter, the plaintiff commenced a declaratory judgment action alleging that he "desire[d] and intend[ed]" to exercise his right of termination under the contract and "desire[d] and intend[ed]" to continue in the business of selling fans and ventilating equipment. *Id.* at 536.

According to the complaint, however, the defendant had asserted that if plaintiff terminated the contract, it would no longer have the right to continue to manufacture any fans and ventilating equipment. In addition, the complaint alleged that defendant "ha[d] led plaintiff to believe" that upon termination of the contract the defendant would sue plaintiff if it did not cease the manufacture and sale of all fans and ventilating equipment. *Id.* at 536. Thus, before issuing any notice of termination of the contract, plaintiff commenced an action requesting a declaration of the rights of the parties in order to prevent the possible accrual of avoidable damages. Specifically,

plaintiff requested that the court declare the right of plaintiff to continue to manufacture and sell fans and other non-infringing products after termination of the agreement, without the payment of further sums to the defendant. *Id.* at 536.

The district court failed to render such a declaration as it concluded that no justiciable controversy was presented. It reasoned that the plaintiff has not yet given notice of termination of the contract and may never do so. *Id.* at 536. According to the district judge:

> In this case, if the court should decide that plaintiff might terminate and continue its manufacture and sale of products other than those covered by the patents, plaintiff might and probably would terminate. If the court should decide otherwise, plaintiff would probably continue under the agreement until its termination and no controversy such as now claimed to exist might ever be present. In other words, plaintiff has not elected what it wishes to do and its action might and could render academic the very declaration which it seeks.

*Id.* at 536.

The Second Circuit, however, reversed, stating that the district court construed the Declaratory Judgment Statute too narrowly. The Second Circuit held:

> Before termination, the controversy is one step further from actuality but not so far removed as to present only an abstract question,.... Once the notice of termination is given, it is beyond recall; the dispute between the parties concerns the right of the plaintiff to continue business if that contingency happens. Where there is an actual controversy over contingent rights, a declaratory judgment may nevertheless be granted.

*Id.* at 536. To make it clear that the contingent nature of the plaintiff's position did not preclude a justiciable controversy, the court went on to say that:

> After bringing the contingency to pass it will be too late to avoid an action for damages if the plaintiff acts as he intends by continuing the business. The very purpose of the declaratory judg-

ment procedure is to prevent the accrual of such avoidable damages.

*Id.* at 536.

Similarly, the facts in this case warrant a finding that an "actual controversy" exists. Like the plaintiff in *De Bothezat*, GSY is a party to a contract that has become uneconomical, and it "desires and intends" to vacate the premises and cease making further rental payments under the Lease upon receipt of a favorable declaration from the Court. Such "desire and intent" is evident from the resolution adopted by the partnership of GSY on October 8, 1991, which provides that:

> It is the desire of the firm to vacate the premises at 430 Park Avenue and cease to pay further rent with respect thereto, and, thereupon to occupy new office space at another location under a new lease reflecting current market conditions; and it is the intention of the firm to take the aforementioned steps upon receiving a judgment declaring its liability in such event would be limited to $380,000.

Proposed Amended Complaint, at ¶ 34.

Moreover, as in *De Bothezat,* where the parties had different views as to what effect termination would have on plaintiff's right to sell certain products, in this case, there is an actual dispute as to what effect Article 52 will have in the event of a breach by GSY. GSY claims that Article 52 provides that its liability is limited to $380,000 if it defaults under the Lease, whereas during negotiations for a possible restructuring of the Lease, the Bank asserted its belief that Article 52 provides no such limitation. Proposed Amended Complaint, at ¶¶ 22, 24, 25, 31, 35, 36; *see also* Def. Reply Mem. In Support, at 7* (the Bank's answer alleges that "the parties have put forth differing views as to the interpretation of Article 52 of the Lease").

In addition, as in *De Bothezat,* the Bank has led GSY to believe that if GSY vacates the premises and fails to make further rental payments, the Bank will sue GSY for the maximum amount of damages permitted by law in the absence

of Article 52. Proposed Amended Complaint, at ¶ 38.[3] According to the proposed amended complaint, in the absence of Article 52, the amount of damages could be as much as approximately eight million dollars. Proposed Amended Complaint, at ¶ 39. Thus, as in *De Bothezat*, unless it can obtain declaratory relief, GSY faces the prospect of significant financial hardship if it carries out its intention to vacate the premises without making further rental payments, and the Bank successfully sues.[4]

*De Bothezat* also establishes that GSY need not undertake an irrevocable course of action to present a justiciable controversy. It is of course beyond dispute that an "actual controversy" would exist if GSY abandoned the premises or made concrete plans to leave by entering into a lease agreement for space elsewhere. But, to require GSY to take such irrevocable actions as vacating the premises or entering a lease for space elsewhere—which would bind GSY simultaneously to two leases and create the possibility of dual liability—in order to adequately allege a justiciable controversy would defeat the purpose of a declaratory judgment procedure which is intended to prevent the accrual of avoidable damages. *See De Bothezat*, 166 F.2d at 536–37 (Declaratory Judgment Act was designed to obviate the peril of a plaintiff having to "act on his own view of his rights" and risking an otherwise profitable business in order to present a justiciable controversy).

3. Such a suit seems to be the only realistic option for the Bank given its economic interests and interpretation of Article 52.

4. In its Memorandum in Opposition to GSY's motion for leave to amend the complaint, the Bank seems to attack certain of the above factual allegations set forth by GSY in the proposed amended complaint. Specifically, the Bank suggests that the resolution adopted by GSY was not enacted in good faith and does not reflect the true desires and intentions of GSY. According to the Bank, GSY's real purpose in bringing this suit is to restructure its present Lease, Def. Mem. In Support, at 11, and is hoping the Court will improve its negotiating position by issuing a declaration that liability is limited to $380,000. Def. Opp. Mem., at 7. As evidence in support of this contention, the Bank points to the fact that GSY adopted the resolution after the Bank moved to dismiss the original complaint and just two days before GSY's papers in response to that motion were due. Def. Opp. Mem., at 3. It also points to the fact that at present there is no new space or new lease. Def. Reply Mem. In Support, at 6. Additionally, the Bank, through the Affidavit of Andrew A. Lance ("Lance Aff."), an attorney at Sullivan & Cromwell who participated in the negotiations between the Bank and GSY, states that GSY has created a false impression with respect to the impact of Article 52 on the negotiations between the parties. According to Lance, Article 52 was not the focal point of the negotiations between the parties, nor did Article 52 prevent the parties from successfully renegotiating the Lease. Lance Aff., at ¶¶ 3, 4; *see also* Def. Opp. Mem., at 3–4.

GSY claims that in determining a motion to dismiss under 12(b)(1) or 12(c), the Court must accept all allegations of the proposed amended complaint as true, and therefore may not consider the Bank's factual arguments and submissions. The Court disagrees.

In considering a factual attack on the jurisdictional allegations of the complaint, i.e., the truth of the jurisdictional facts alleged by the plaintiff is challenged, a court may receive any competent evidence, such as affidavits, in order to determine the factual dispute. 2A Moore's Federal Practice, ¶ 12.07 at 12–46, 12–47. Further, so long as the court permits the plaintiff an opportunity to demonstrate that jurisdiction exists, the court can consider such evidence without converting the motion into one for summary judgment. 2A Moore's Federal Practice, ¶ 12.07 at 12–48.

In this case, however, it is not necessary to postpone decision so that GSY can submit affidavits or other evidence because the Bank has not substantiated its challenge to GSY's jurisdictional allegations. First, the Bank has provided no support for its assertions that GSY is using this suit as a negotiating ploy. The resolution of the partnership unequivocally states that GSY "desires and intends" to vacate the premises and cease paying further rent if the Court renders a favorable judgment, and the Bank proffers no probative evidence to the contrary. According to the proposed amended complaint, GSY has retained a real estate broker to search for new space, Proposed Amended Complaint, at ¶ 19, the broker has presented GSY with a proposal for new space, Proposed Amended Complaint, at ¶¶ 20, 30, and GSY has had architectural drawings prepared for that space. Proposed Amended Complaint, at ¶ 30.

Second, the Bank's assertions that Article 52 was not the focal point of the negotiations and negotiations did not break down because of Article 52 are irrelevant since, under *De Bothezat*, it is not essential for GSY to establish the existence of such facts to allege a justiciable controversy.

Thus, *De Bothezat* instructs that having alternatives open, even after a declaration by the Court, is not fatal to a claim for declaratory relief, and the Court finds that the present controversy is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.*, 312 U.S. at 273, 61 S.Ct. at 512.

Despite the above analysis, the Bank contends that *De Bothezat* is not controlling as it presents a factual situation markedly different from the case at bar. According to the Bank, *De Bothezat* was a case involving patent rights, not contract rights, and thus falls within the category of cases in which declaratory judgment jurisdiction is most liberally allowed. *See Broadview Chemical Corp., v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.1969), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970). This is clearly not the case. Although *De Bothezat* involves patents, patents were only discussed by the court in the context of the parties' contractual rights.

The Bank also contends that *De Bothezat* is distinguishable from the case at bar because in that case, the defendant was threatening to put plaintiff out of business if plaintiff terminated a contract that did not provide it with any commercial benefit, whereas here there has been no attempt to force a competitor out of business. In addition, according to the Bank, in this case, GSY is not alleging that the Lease provides it with no commercial benefit. Finally, the Bank contends that unlike the plaintiff in *De Bothezat* who was forced to pay an unspecified fee each year that depended on its total sales and was faced with open-ended and indefinite accrual of potential damages by remaining in business, GSY must pay a definite rental for a definite period of time and knows the outside limit of its potential liability.

The Bank is correct that the above factors distinguish the two cases, but its argument that these factors warrant a different result in the present case is untenable as the *De Bothezat* court did not rely on any of these factors in making its determination that there was a justiciable controversy.

Decisions of federal courts in other circuits also make clear that the present controversy is justiciable under Article III. *See, e.g., Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp.*, 190 F.2d 985, 989 (10th Cir.1951) ("a party to a contract is not compelled to wait until he has committed an act which the other party asserts will constitute breach, but may seek relief by declaratory judgment and have the controversy adjudicated in order that he may avoid the risk of damages or other untoward consequence");[5] *Fine v. Property Damage Appraisers, Inc.*, 393 F.Supp. 1304, 1310 (E.D.La.1975) (party contemplating breach of covenant not to compete entitled to seek declaratory relief as to validity of covenant, since "otherwise plaintiff is left to test it only by his breach of contract, subjecting himself to the risk that the clause be held enforceable and that he suffer the severe consequences of being enjoined from working in a similar line of business for a matter of years").

2. Cases Relied Upon by the Bank

Almost all the cases relied upon by the Bank are inapposite to this case, and merely state blanket principles of declaratory judgment jurisdiction. *See, e.g., Coffman v. Breeze Corp., Inc.*, 323 U.S. 316, 65 S.Ct. 298, 89 L.Ed. 264 (1945) (in preemptive suit to enjoin the enforcement of the Royalty Adjustment Act, based on the alleged unconstitutionality of the Act, the court declined to adjudicate as the complainant had not sought recovery of any royalties); *M & M Transport Co. v. U.S. Industries, Inc.*, 416 F.Supp. 865 (S.D.N.Y.1976) (court de-

---

5. The Bank contends that *Keener* can be distinguished from the present case because in that case, the defendant presented a clear and unconditional obstacle to the plaintiff's proposed pursuit of an essential aspect of its business. As in *De Bothezat*, however, the *Keener* court did not rely on that fact in making its determination

that an "actual controversy" existed. In fact, it appears that like the *De Bothezat* court, the *Keener* court was concerned more with the broader proposition that a party to a contract should not have to risk substantial damages in order to present a justiciable controversy. *Keener*, 190 F.2d at 989.

termined that dispute between two entities over a tax refund was not justiciable as Internal Revenue Service had not yet determined that a tax refund was due); *People of the State of Illinois v. Archer Daniels Midland Co.*, 704 F.2d 935 (7th Cir.1983) (prosecutor undecided as to whether to prosecute not entitled to declaratory judgment on constitutional question of federal preemption).

Further, although more similar to the case at bar, *Perlberg v. Northwestern Mutual Life Ins. Co.*, 62 F.Supp. 76 (E.D.Pa. 1945), does not compel the conclusion that GSY has failed to allege a justiciable case or controversy. In that case, the plaintiff insured wrote to defendant requesting a calculation of the extended period of insurance in the event he defaulted on his premium payments. Defendant computed that, in the event of default, the insured would be entitled to term insurance for thirty-two days from the date of default. Plaintiff disputed defendant's method of computing the extended term insurance, and thus sought judicial interpretation of the relevant clauses in the policy and a declaration that defendant calculate the extended term insurance in accordance with plaintiff's interpretation of the policy. *Id.* at 77–78. As of the date of trial, however, the insured had not defaulted in the payment of premiums. The court found that no case or controversy existed and stated that "[u]ntil plaintiff's hypothesis of default becomes an actuality, the differences of the parties will not be ripe for adjudication and a petition for a declaration of rights would be premature." *Id.* at 78.

Despite the apparent similarities, the *De Bothezat* court specifically distinguished *Perlberg*. It stated that the plaintiff in *Perlberg* "would have been able even in the event of a default to reinstate his policy without penalty." *De Bothezat,* 166 F.2d at 537. By contrast, a default by plaintiff in *De Bothezat,* or by GSY in this case, would be irreversible and would subject the parties to significant financial hardship.

For the reasons stated above, the Court finds that the proposed amended complaint sufficiently alleges a justiciable controver-

sy. Accordingly, amendment of the complaint would not be futile, and GSY's motion for leave to amend the complaint is granted. For the same reasons, the Bank's motion to dismiss for lack of subject matter jurisdiction is denied.

## II. Discretion to Exercise Declaratory Jurisdiction

Even when justiciability is present in the form of an actual controversy, it is still within the discretion of the Court to decline to hear a declaratory judgment action. *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942); *Great American Ins. Co. v. Houston General Ins. Co.*, 735 F.Supp. 581, 584 (S.D.N.Y.1990). In deciding whether to render declaratory relief, a court should be guided by the criteria set forth in *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d at 998. In that case, the Second Circuit stated that "the two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* In addition, "if either of these objectives can be achieved the action should be entertained and the failure to do so is error." *Id.*

In this case, both objectives will be achieved if the Court issues a declaratory judgment. Declaratory relief will clearly terminate the uncertainty and insecurity giving rise to this proceeding by adjudicating the rights of both parties under Article 52 of the Lease, and it will serve a useful purpose in clarifying and settling the legal relations in issue as there will be no need for future litigation after the Court determines the effect of Article 52 of the Lease.

### Conclusion

For the aforementioned reasons, GSY's motion for leave to amend the complaint is granted, and the Bank's motion to dismiss the complaint, pursuant to Rule 12(b)(1) and 12(c), is denied. The Bank shall respond to the amended complaint within

twenty days of the date of this order. Further, in its discretion the Court shall proceed with the declaratory judgment action.

SO ORDERED.