Justice Thomas,
dissenting.
We granted certiorari in this case to determine whether a patent licensee in good standing must breach its license prior to challenging the validity of the underlying patent pursuant to the Declaratory Judgment Act, 28 U. S. C. §2201. 546 U. S. 1169 (2006). The answer to that question is yes. We have consistently held that parties do not have standing to obtain rulings on matters that remain hypothetical or conjectural. We have also held that the declaratory judgment procedure cannot be used to obtain advanced rulings on matters that would be addressed in a future case of actual controversy. Medlmmune has sought a declaratory judgment for precisely that purpose, and I would therefore affirm the Court of Appeals’ holding that there is no Article III jurisdiction over Medlmmune’s claim. The Court reaches the opposite result by extending the holding of Steffel v. Thompson, 415 U. S. 452 (1974), to private contractual obligations. I respectfully dissent.
I
Article III of the Constitution limits the judicial power to the adjudication of “Cases” or “Controversies.” § 2. We *138 have held that the Declaratory Judgment Act extends “to controversies which are such in the constitutional sense.” Aetna Life Ins. Co. v. Haworth, 300 U. S. 227, 240 (1937). In the context of declaratory judgment actions, this Court's cases have provided a uniform framework for assessing whether an Article III case or controversy exists. In the constitutional sense, a “Controversy” is “distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot.” Ibid, (citing United States v. Alaska S. S. Co., 253 U. S. 113, 116 (1920)). “The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.” 300 U. S., at 240-241. Finally, “[i]t must be a real and substantial controversy ..., as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.” Id., at 241.
The Declaratory Judgment Act did not (and could not) alter the constitutional definition of “case or controversy” or relax Article Ill's command that an actual case or controversy exist before federal courts may adjudicate a question. See Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U. S. 270, 272-273 (1941). Thus, this Court has held that “the operation of the Declaratory Judgment Act is procedural only.” Aetna Life Ins., 300 U. S., at 240. In other words, the Act merely provides a different procedure for bringing an actual case or controversy before a federal court. The Court applied that principle in Aetna Life Ins., where an insurance company brought a declaratory judgment action against an insured who claimed he had become disabled, had formally presented his claims, and had refused to make any more insurance payments. Id., at 242. In the course of deciding that it could entertain the insurer’s declaratory judgment action, the Court specifically noted that, had the insured filed his traditional cause of action first, “there would have been no question that the controversy was of a justiciable nature . . . .” Id., at 243. Accordingly, the Act merely *139 provided a different procedural tool that allowed the insurance company to bring an otherwise justiciable controversy before a federal court.
We have also held that no controversy exists when a declaratory judgment plaintiff attempts to obtain a premature ruling on potential defenses that would typically be adjudicated in a later actual controversy. In Coffman v. Breeze Corps., 323 U. S. 316 (1945), a patent owner brought a declaratory judgment action against his licensees seeking to have the Royalty Adjustment Act of 1942 declared unconstitutional and to enjoin his licensees from paying accrued royalties to the Government. This Court held that no case or controversy existed because the validity of the Royalty Adjustment Act would properly arise only as a defense in a suit by the patent holder against the licensees to recover royalties. Id., at 323-324. Accordingly, the complaint at issue was “but a request for an advisory opinion as to the validity of a defense to a suit for recovery of the royalties.” Id., at 324. And the Court noted that “[t]he declaratory judgment procedure . .. may not be made the medium for securing an advisory opinion in a controversy which has not arisen.” Ibid.; see also Calderon v. Ashmus, 523 U. S. 740, 747 (1998) (holding that a prisoner may not use a declaratory judgment action to determine the validity of a defense that a State might raise in a future habeas proceeding).
These principles apply with equal force in the patent licensing context. In Altvater v. Freeman, 319 U. S. 359, 365-366 (1943), the Court, quite unremarkably, held that a “licensee” had standing to bring a declaratory judgment counterclaim asserting the affirmative defense of patent invalidity in response to a patent infringement suit. But not to be mistaken, the Altvater Court expressly stated that “[t]o hold a patent valid if it is not infringed is to decide a hypothetical case.” Id., at 363. So too, in Cardinal Chemical Co. v. Morton Int'l, Inc., 508 U. S. 83, 86 (1993), the affirmative defense of patent invalidity was raised as a coun *140 terclaim to a patent infringement suit. Although we held that a finding of noninfringement on appeal did not moot a counterclaim alleging invalidity, id., at 102-103, we stated that our holding was limited to the jurisdiction of an appellate court and reiterated that “[i]n the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy,” id., at 95.
II
Against the foregoing background, the case before us is not a justiciable case or controversy under Article III.
A
As a threshold matter, I disagree with the Court’s characterization of this case as including a “contractual dispute.” Ante, at 125. To substantiate this characterization, the Court points to a three-paragraph count in Medlmmune’s complaint entitled “‘DECLARATORY JUDGMENT ON CONTRACTUAL RIGHTS AND OBLIGATIONS’” and to Medlmmune’s broad allegations that “‘its Synagis® product does not infringe any valid claim of the [Cabilly II] Patent.’ ” Ante, at 123. Nowhere in its complaint did Medlmmune state why “sale[s] of its Synagis® product d[o] not infringe any valid claim of the [Cabilly II] Patent.” App. 136.[1] Given the lack of specificity in the complaint, it is hardly surprising that the Court never explains what the supposed contract dispute is actually about. A fair reading of the amended complaint (and a review of the litigation thus far) shows that Medlmmune’s “contract count” simply posits that because the patent is invalid and unenforceable (as alleged in counts II and III), Medlmmune is not bound by its con *141 tractual obligations. As the Court admits, “the license requires [Medlmmune] to pay royalties until a patent claim has been held invalid by a competent body . . . .” Ante, at 124 (emphasis in original). Thus, even assuming the existence of a cognizable contract claim, the validity of that claim hinges entirely upon a determination of the patent’s validity, independent of any contractual question. As such, Medlmmune’s “contract claim” simply repackages its patent invalidity claim.
Probably for this reason, Medlmmune has not pursued a contract claim at any level of the litigation. The District Court stated that the product that was the subject of the license, Synagis, was “covered by the patents at issue,” App. 349-350, and Medlmmune has never challenged that characterization. The Federal Circuit decided this case on the sole ground that a licensee in good standing may not bring a declaratory judgment action to challenge the validity of the underlying patent without some threat or apprehension of a patent infringement suit. See 427 F. 3d 958, 965 (2005). The question Medlmmune presented in its petition for certiorari, which we accepted without alteration, says nothing about a contract claim. Neither does Medlmmune’s opening brief allege a contractual dispute. Even at oral argument, it was not Medlmmune, but an amicus, that alleged there was a contract dispute at issue in this case. Tr. of Oral Arg. 21-22.
In short, Medlmmune did not “rais[e] and preserv[e] a contract claim.” Ante, at 125. In reaching a contrary conclusion, the Court states that its identification of a contract claim “probably makes no difference to the ultimate” outcome of this case. Ante, at 123. This may very well be true, if only because of the broad scope of the Court’s holding.
B
The facts before us present no case or controversy under Article III. When Medlmmune filed this declaratory judg *142 ment action challenging the validity of the Cabilly II patent, it was under no threat of being sued by Genentech for patent infringement. This was so because Medlmmune was a licensee in good standing that had made all necessary royalty payments. Thus, by voluntarily entering into and abiding by a license agreement with Genentech, Medlmmune removed any threat of suit. See ante, at 128 (stating the threat of suit was “remote, if not nonexistent”). Medlmmune’s actions in entering into and continuing to comply with the license agreement deprived Genentech of any cause of action against Medlmmune. Additionally, Medlmmune had no cause of action against Genentech. Patent invalidity is an affirmative defense to patent infringement, not a freestanding cause of action. See 35 U. S. C. §§282(2)-(3). Therefore, here, the Declaratory Judgment Act must be something more than an alternative procedure for bringing an otherwise actual case or controversy before a federal court. But see Aetna Life Ins., 300 U. S., at 240 (“[T]he operation of the Declaratory Judgment Act is procedural only”).
Because neither Genentech nor Medlmmune had a cause of action, Medlmmune’s prayer for declaratory relief can be reasonably understood only as seeking an advisory opinion about an affirmative defense it might use in some future litigation. Medlmmune wants to know whether, if it decides to breach its license agreement with Genentech, and if Genentech sues it for patent infringement, it will have a successful affirmative defense. Presumably, upon a favorable determination, Medlmmune would then stop making royalty payments, knowing in advance that the federal courts stand behind its decision. Yet as demonstrated above, the Declaratory Judgment Act does not allow federal courts to give advisory rulings on the potential success of an affirmative defense before a cause of action has even accrued. Calderon, 523 U. S., at 747 (dismissing a suit that “attempted] to *143 gain a litigation advantage by obtaining an advance ruling on an affirmative defense”); see also Coffman, 323 U. S., at 324 (rejecting use of the Declaratory Judgment Act as a “medium for securing an advisory opinion in a controversy which has not arisen”). Medlmmune has therefore asked the courts to render “an opinion advising what the law would be upon a hypothetical state of facts.” Aetna Life Ins., supra, at 241; see also Public Serv. Comm’n of Utah v. Wycoff Co., 344 U. S. 237, 244 (1952) (“The disagreement must not be nebulous or contingent but must have taken on fixed and final shape . . . ”). A federal court cannot, consistent with Article III, provide Medlmmune with such an opinion.
Finally, as this Court has plainly stated in the context of a counterclaim declaratory judgment action challenging the validity of a patent, “[t]o hold a patent valid if it is not infringed is to decide a hypothetical case.” Altvater, 319 U. S., at 363. Of course, Medlmmune presents exactly that case. Based on a clear reading of our precedent, I would hold that this ease presents no actual case or controversy.
Ill
To reach today’s result, the Court misreads our precedent and expands the concept of coercion from Steffel, 415 U. S. 452, to reach voluntarily accepted contractual obligations between private parties.
A
The Court inappropriately relies on Altvater, which is inapplicable to this case for three reasons. First, in Altvater, the affirmative defense of patent invalidity arose in a declaratory judgment motion filed as a counterclaim to a patent infringement suit. See 319 U. S., at 360. Second, the opinion in Altvater proceeds on the understanding that no license existed. Both the District Court and the Court of Appeals had already held that the underlying license had been terminated prior to the filing of the case. Id., at 365 (“Royalties *144 were being demanded and royalties were being paid. But they were being paid ... under the compulsion of an injunction decree”). Third, and related, though the one-time licensee continued to pay royalties, it did so under the compulsion of an injunction that had been entered in a prior case. Ibid. Altvater simply held that under the unique facts of that case, the Court of Appeals erred in considering the declaratory judgment counterclaim moot because the “involuntary or coercive nature of the exaction preserve[d] the right to recover the sums paid or to challenge the legality of the claim.” Ibid.
Cardinal Chemical Co., 508 U. S. 83, is similarly inapt here. In that case, as in Altvater, the defendant raised the affirmative defense of patent invalidity in a counterclaim to a patent infringement suit. 508 U. S., at 86. We specifically held that a finding of noninfringement on appeal did not moot a counterclaim alleging invalidity. Id., at 102-103. But we stressed:
“[T]he issue before us, therefore[,] concernís] the jurisdiction of an intermediate appellate court — not the jurisdiction of... a trial court.... In the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy.” Id., at 95.
We went on to offer a hypothetical that showed a party could seek a declaratory judgment “[i]n patent litigation ... even if the patentee has not filed an infringement action.” Ibid. However, that hypothetical involved a patent holder that threatened an infringement suit against a competitor Cnot a licensee) that continued to sell the allegedly infringing product and faced growing liability. In doing so, we hypothesized a situation that paralleled the facts in Aetna Life Ins.: The patentee had a cause of action against an alleged infringer and could have brought suit at any moment, and the declaratory judgment procedure simply offered the alleged *145 infringer a different method of bringing an otherwise justiciable case or controversy into court.[2]
B
The Court’s more serious error is its extension of Steffel, supra, to apply to voluntarily accepted contractual obligations between private parties. No court has ever taken such a broad view of Steffel.
In Steffel, the Court held that in certain limited circumstances, a party’s anticipatory cause of action qualified as a case or controversy under Article III. Based expressly on the coercive nature of governmental power, the Court found that “it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.” Id., at 459 (emphasis added). Limited, as it is, to governmental power, particularly the power of arrest and prosecution, Steffel says nothing about coercion in the context of private contractual obligations. It is therefore not surprising that, until today, this Court has never applied Steffel and its theory of coercion to private contractual obligations; indeed, no court has ever done so.[3]
The majority not only extends Steffel to cases that do not involve governmental coercion, but also extends Steffel’s rationale. If “coercion” were understood as the Court used *146 that term in Steffel, it would apply only if Genentech had threatened Medlmmune with a patent infringement suit in the absence of a license agreement. At that point, Medlmmune would have had a choice, as did the declaratory plaintiff in Steffel, either to cease the otherwise protected activity (here, selling Synagis) or to continue in that activity and face the threat of a lawsuit. But Medlmmune faced no such choice. Here, Medlmmune could continue selling its product without threat of suit because it had eliminated any risk of suit by entering into a license agreement. By holding that the voluntary choice to enter an agreement to avoid some other coerced choice is itself coerced, the Court goes far beyond Steffel.
The majority explains that the “coercive nature of the exaction preserves the right ... to challenge the legality of the claim.” Ante, at 131 (internal quotation marks omitted). The coercive nature of what “exaction”? The answer has to be the voluntarily made license payments because there was no threat of suit here. By holding that contractual obligations are sufficiently coercive to allow a party to bring a declaratory judgment action, the majority has given every patent licensee a cause of action and a free pass around Article Ill’s requirements for challenging the validity of licensed patents. But the reasoning of today’s opinion applies not just to patent validity suits. Indeed, today's opinion contains no limiting principle whatsoever, casting aside Justice Stewart’s understanding that Steffel’s use would “be exceedingly rare.” 415 U. S., at 476 (concurring opinion).
For the foregoing reasons, I respectfully dissent.

 In addition, the fact that Medlmmune did not identify anywhere in the record which provision of the contract was at issue suggests that there is no contractual provision to “be construed before or after breach.” Advisory Committee’s Notes on Fed. Rule Civ. Proc. 57, 28 U. S. C. App., pp. 790-791.

 Additionally, Lear, Inc. v. Adkins, 395 U. S. 653 (1969), has little to do with this ease. It addressed the propriety and extent of the common-law doctrine of licensee estoppel, and the licensee in Lear had ceased making payments under the license agreement — a fact that makes the case singularly inapposite here. Id., at 659-660. Lear did not involve the Declaratory Judgment Act because the case was brought as a breach-of-contract action for failure to pay royalties.

 Admitting that such decisions are “rare,” ante, at ISO, the Court cites cases predating Steffel that hold that a court may construe contractual provisions prior to breach. Those cases do not rely on the coercion inherent in making contractual payments. See, e. g., Keener Oil & Gas Co. v. Consolidated Gas Util. Corp., 190 F. 2d 985, 989 (CA10 1951).