**HERTZOG, CALAMARI & GLEASON, Plaintiff,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.**

**No. 93 Civ. 6395 (CSH).**

United States District Court, S.D. New York.

March 21, 1996.

247

Hertzog, Calamari & Gleason, New York City (Anthony L. Paccione, Loretta Shaw–Lorello, of counsel), for Plaintiff.

Bachner, Tally, Polevoy & Misher, New York City (H. Richard Penn, Todd Marcus, of counsel), for Defendant.

*MEMORANDUM OPINION*
*AND ORDER*

HAIGHT, Senior District Judge:

This diversity action arises out of a dispute as to the proper interpretation of a real estate lease between plaintiff law firm Hertzog, Calamari & Gleason ("HC & G")—the tenant—and defendant Prudential Insurance Company ("Prudential")—the owner and landlord of the property.

Plaintiff moves the Court for summary judgment on its first cause of action for a declaratory judgment (1) establishing the maximum liability of HC & G and of its individual partners, and (2) ruling that HC & G may cancel or terminate the lease by vacating the property and paying the stipulated damages set forth in the lease modification. For the reasons stated below, the motion is granted in part and denied in part.

*FACTS*

HC & G is a New York City law firm with offices at 100 Park Avenue, a building owned by Prudential. On May 16, 1989, HC & G and Prudential entered into a ten-year lease for portions of three floors of 100 Park Avenue. Included among the lease's provisions was a section articulating the liability of individual HC & G partners:

the liability of each of the partners of Partnership Tenant shall be several and limited to, and in no event exceed, their individual per capita share of One Million Dollars ($1,000,000), as determined by the number of partners listed on the latest schedule of partners in Partnership Tenant, which schedule shall be provided to Landlord by Tenant annually (by way of example), if the latest schedule of partners lists ten (10) partners of Partnership Tenant, then each partner's liability under the lease shall be limited to One Hundred Thousand Dollars ($100,000). . . .

Paccione Aff., Exh. A at § 55.

In the spring of 1990, HC & G lost two partners from its law firm and sought to modify the lease to alter the proportionally greater personal liability resting upon the shoulders of the remaining individual partners of HC & G. In a letter dated May 2, 1990, HC & G wrote to Prudential's agent requesting a lease modification to stabilize and cap the potential individual liability faced by its partners. Paccione Aff., Exh. C. Prudential refused to modify the lease at that time.

A third, quite senior, partner left HC & G in the summer of 1990, again raising concerns among the firm's remaining partners as to their potential individual liability. HC & G again approached Prudential about modifying the lease, spelling out its proposal to alter Section 55 to allow "a reduction in the liability of Partnership Tenant" in a letter dated July 31, 1990. Paccione Aff., Exh. L at 1.

Lease modification negotiations began between the parties, and a Modification was formally executed on May 6, 1991. Neither party disputes the validity or binding nature of this Modification. The Modification provided that:

1. Notwithstanding any provision of the Lease to the contrary, in the event of any cancellation or termination of the Lease, the liability of Partnership Tenant and the partners of Partnership Tenant under the lease shall be as set forth below:

(i) the liability of Partnership Tenant shall not exceed One Million Dollars ($1,000,000) (the "Aggregate Liability"). The liability of each of the partners of Partnership Tenant for the Aggregate Liability shall be several and shall be limited to, and in no event exceed, their individual per capita share of the Aggregate Liability, as determined by the number of partners listed on the latest schedule of partners in the Partnership Tenant, which schedule shall be provide to Landlord by Tenant annually (by way of example, if the latest schedule of partners lists ten (10) partners of Partnership Tenant, then each partner's liability under the Lease shall be limited to One Hundred Thousand Dollars ($100,000) during the first Lease Year (as defined herein);

(ii) the Aggregate Liability of Partnership Tenant and the partners of Partnership Tenant shall be *reduced by $100,000 for each of the first five consecutive Lease Years* of the Lease such that the Aggre-

gate Liability shall be $500,000 at the end of the fifth Lease Year under said Lease....

(iii) in the event the schedule of partners submitted by Partnership Tenant reflects a number of partners such that the several liability of any one partner for his or her share of the Aggregate Liability equals or exceeds $125,000 (said amount being calculated by dividing the Aggregate Liability relevant at the time by the number of partners on the latest schedule of partners submitted by Partnership Tenant), then Landlord may look to the schedule of partners submitted immediately prior to the list in question and to prior schedules of partners in reverse chronological order until that schedule of partners is reached for whom the several liability of any one partner for his or her share of the Aggregate Liability is less than $125,000 per partner, and the partners listed on all such schedules shall be liable for their per capita share of the Aggregate Liability in the event of subsequent termination or cancellation of the Lease.

2. Except as otherwise amended hereby, all terms of the Lease shall remain in full force and effect.

Paccione Aff., Exh. D at 1–2.

In the summer of 1992, HC & G approached Prudential requesting a renegotiation of its rent. Prudential responded, by a September 8, 1992 letter from its agent Cushman and Wakefield, that although Prudential valued HC & G's tenancy, it was "unwilling at this time to change these lease provisions in return for a longer lease commitment." Penn.Aff., Exh. 12 at 1. HC & G then reached an agreement with the owners of another building, and wrote to Prudential on October 21, 1992 requesting a meeting "to discuss a mutually agreeable termination date" for the 100 Park Avenue lease. Paccione Aff., Exh. F at 1. HC & G alleges that "Prudential refused to recognize HC & G's exercise of its rights under the Modification, and instead of arranging for a turn over of possession as requested by HC & G, Prudential threatened to sue the firm for rent each month through the end of the maximum term of the Lease." Plaintiff's Memorandum of Law ("PM") at 10. HC & G thus seeks a declaratory judgment to resolve the interpretive dispute over Section 55.

Prudential opposes this summary judgment motion on the ground that disputed material facts underlie plaintiff's claims. Additionally, Prudential asserts that since plaintiff

never actually attempted termination by serving defendant with a notice thereof or by vacating the premises ... defendant has never faced the decision, as a fact, of whether or not to reject an "attempted termination" of where or not to "recognize the limitation of liability set forth in the Modification."

Defendant's 3(g) Statement at ¶ 8. Accordingly, Prudential argues that no "plaintiff presents no statutorily sanctioned 'actual controversy' within this Court's jurisdiction" as required by 28 U.S.C. § 2201. *Id.* at ¶ 9.

## DISCUSSION

### 1. Propriety of Declaratory Judgment

█ As a first step, this Court will ascertain whether the parties are embroiled in an "actual controversy." I examine this question because I have an independent, constitutional obligation to protect the jurisdictional limits of the federal courts. I must note before beginning, however, that I pursue this inquiry in spite of defendant's efforts, not because of them. Defendant does not cross-move for summary judgment, nor does it move to dismiss the complaint, on the ground that plaintiff's allegations are jurisdictionally insufficient under 28 U.S.C. § 2201. Nor does defendant make more than a passing reference to such argument in its memorandum of law in response to plaintiff's motion for summary judgment. Rather, defendant articulates the claim, unsupported by any case citations, in its Local Civil Rule 3(g) statement.

Local Civil Rule 3(g) requires the party opposing a summary judgment motion to provide the Court with a "short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." It is entirely inappropriate for a party to make lengthy, conclusory legal

arguments in a 3(g) statement, and entirely unhelpful to the Court. Were I not bound by an independent duty to consider this jurisdictional question, I would refuse to consider the legal argument articulated primarily in Prudential's 3(g) statement.

▓ Nonetheless, I now turn to the analysis of whether plaintiff's complaint alleges a justiciable controversy. Judge Kram's recent decision in a case presenting a nearly identical factual situation simplifies the task significantly. *Gilbert, Segall and Young v. Bank of Montreal,* 785 F.Supp. 453 (S.D.N.Y. 1992). In *Gilbert,* the parties disputed the meaning of a modified lease term which provided for the annual reduction of the tenant's liability under the lease. *Gilbert,* 785 F.Supp. at 455. The plaintiff tenant, GSY, wished to default under the lease, vacate the premises, and pay what it alleged were the stipulated damages. *Id.* at 457. The defendant owner rejected GSY's interpretation of the lease and threatened to sue GSY if it vacated the leased premises. *Id.*

Judge Kram held that this situation presented a justiciable "actual controversy." *Id.* at 461. According to Judge Kram,

> It is of course beyond dispute that an "actual controversy" would exist if GSY abandoned the premises or made concrete plans to leave by entering into a lease agreement for space elsewhere. But, to require GSY to take such irrevocable actions as vacating the premises or entering a lease for space elsewhere—which would bind GSY simultaneously to two leases and create the possibility of dual liability—in order to adequately allege a justiciable controversy would defeat the purpose of a declaratory judgment procedure which is intended to prevent the accrual of avoidable damages.

*Id.,* citing *American Machine & Metals, Inc. v. De Bothezat Impeller Co.,* 166 F.2d 535 (2d Cir.1948).

Because the facts of the case at bar so closely resemble those in *Gilbert,* and because I agree with Judge Kram's reasoning in that case, I hold that HC & G has alleged an actual, justiciable controversy in this case. The Court therefore has subject matter juris-diction over the case under 28 U.S.C. § 2201 and 28 U.S.C. 1332(a)(2).

## 2. Cancellation Rights Under The Lease

Plaintiff asks the Court to declare its rights under the lease as modified. One essential question is whether the lease allows the plaintiff to cancel the lease and pay stipulated damages; the other essential question is what those damages should be.

▓ According to the plaintiff's Memorandum of Law, the Modification was intended to allow HC & G to cancel the lease, walk away from the property, and pay the stipulated damages. PM at 13. HC & G asserts that

> to that end, the Modification clearly provides that it applies "in the event of *any* termination or cancellation of the Lease", not just unilateral termination by Prudential. To construe it otherwise would simply render the Modification meaningless because, in the event of a default, the firm and its partners would be exposed to enormous liability for rent for the entire term of the Lease, unless *Prudential chose* to terminate the lease. Leaving the effectiveness of the liability limitation in Prudential's hands would be cold comfort indeed to HC & G and its partners.

PM at 13–14 (emphasis in original). HC & G emphasizes that the "termination and cancellation" language was included in the Modification to "address the issue of HC & G's desire to be able to cancel the Lease by paying a sum certain to Prudential." *Id.* at 15.

Prudential reads the Modification's cancellation language differently. Despite the Modification's reference to "*any* cancellation or termination," defendant argues that "section 55's limitation on individual partners' liability did not affect defendant's remedies of 'cancellation' or 'termination' under the main lease." Defendant's Memorandum of Law ("DM") at 23. According to Prudential, Sections 16, 17, and 54 of the main lease provide the owner with the option of canceling or terminating the lease, not the tenant. Paccione Aff., Exh. A, §§ 16, 17, 54. Prudential further asserts that since the discus-

sions and negotiations prior to the Modification concerned only changes in HC & G's liability, and not changes in the cancellation rights scheme of the lease, it would have been beyond Prudential's "reasonable expectations" to alter the cancellation scheme in the Modification. DM at 38. Fundamentally, Prudential's argument is that there is a genuine dispute as to the meaning of, and the parties' intent in drafting, the phrase "any cancellation or termination of the lease."

Depositions of those involved in the Modification negotiations illuminate the differences of interpretation. William Simon, the HC & G partner who negotiated and drafted the Modification, testified as to his understanding of the cancellation rights:

> Penn[1]: Was the subject matter of cancellation or termination of the lease ever discussed during any conversation you had with Mr. Vittorio?
>
> Simon: Yes. As I related, the discussion that we had at the end of the summer of 1990 were to the effect that if the firm couldn't be viable in our existing space, we wanted to be able to walk away from the lease by paying a sum certain. I don't know that we used the specific term "cancellation" or "termination." But we had the discussion I've just related.

Penn.Aff., Exh. 4 (Simon Deposition) at 45–46. This assertion is bolstered by a memorandum for files Simon wrote on September 5, 1990, which states that "I told him that, in my view, the provision was crystal clear in that it allowed the firm and all of its partners to merely walk away from the lease by paying the penalty with no further liability. He agreed with my interpretation...." Paccione Aff., Exh. J at 1.

Later in his deposition, however, Simon muddied his description of the purpose of the Modification:

> Penn: But, in fact, if the firm walked out, it could then be sued for whatever damages the landlord could demonstrate it sustained as a result of that breach.
>
> Simon: Under the original lease I believe that's a correct statement.
>
> \* \* \* \* \* \*

---

1. H. Richard Penn, Esq., counsel for Prudential.

> Penn: Is it your contention that that language ... removed the default provisions as operative as written in the printed portion of the lease?
>
> Simon: You are referring now to Paragraph 17 of the original lease?
>
> Penn: And 54.
>
> Simon: Well, I think the language means what it says, that unless the amendment addresses it, the lease stands.
>
> Penn: Well, I'm asking whether or not it was your understanding as the draftsman, the principal draftsman of the lease as finally executed, that the language in Paragraph 2 effectively rendered inoperative Paragraphs 17 and 54 of the lease.
>
> Simon: I don't know that I had any such understanding one way or the other.

Penn.Aff., Exh. 4 at 63–64. Simon's intent as to the effect of the modification of the underlying lease was further probed with these questions:

> Penn: My question is directed to the prefatory Paragraph 1 and the phrase therein which did not appear until the blank day of September 1990 draft that you had prepared, quote, in the event of any cancellation or termination of the lease.
>
> Did the inclusion of that phrase in the Modification modify cancellation or termination rights of the landlord contained in the lease dated May 16, 1989, before the amendment?
>
> \* \* \* \* \* \*
>
> Simon: I don't believe so.
>
> Penn: I take it as the draftsman it was not your intention to modify the landlord's rights with respect to cancellation or termination; is that right?
>
> Simon: Yes.

Penn.Aff., Exh. 4 at 103–04 (objection omitted).

Prudential's witness remembered no discussion of cancellation rights during the Modification negotiations. According to Steven Vittorio, then Prudential's manager of 100 Park Avenue, the Modification applied

only to changes in HC & G's liability, not to the lease's cancellation scheme. Vittorio denied that he ever discussed the matter with Simon:

> Mollon[2]: Do you recall Mr. Simon in the course of conversations with you telling you that it was his understanding of the proposal that it would allow the firm and its partners to walk away from the lease by paying a penalty with no further liability?
>
> Vittorio: Absolutely not.

Penn.Aff., Exh. 6 at 43. Not only did Vittorio testify that cancellation scheme changes were never discussed, he added that he would have been unable to agree to such changes had he known they were on the table:

> Mollon: If you could look now at Plaintiff's 17, the modification to the lease, in paragraph 1, in the second line, where it starts off by saying "notwithstanding any provision of the lease to the contrary, in the event of any cancellation or termination of the lease," and then it goes on.
>
> According to what you said, my understanding was that that language does not add or detract from your understanding of what the original lease provided.
>
> Vittorio: Correct. We were never negotiating rights to cancel or terminate. This purely pertains to the original lease where landlord had certain rights to cancel or terminate.
>
> Mollon: In negotiating the language your understanding was that that didn't change anything?
>
> Vittorio: Correct. In fact, let me add, neither myself nor, I believe, Sharon Barnes would have had any authority to grant any kind of cancellation right changes to the lease. This purely was referring to the existing cancellation and termination rights, and no discussion with Mr. Simon or anyone else from Hertzog Calamari ever revolved around termination and cancellation.

Penn.Aff., Exh. 6 at 85–86.

▮ It is clear from these submissions that this dispute cannot be resolved by summary judgement. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. In assessing contract disputes in this Circuit, "[q]uestions of intent ... are usually inappropriate for disposition on summary judgment." *National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 205 (2d Cir.1989). Even where contract or lease language is facially unambiguous, "[i]t is only where the language and the inferences to be drawn from it are unambiguous that a district court may construe the contract as a matter of law and grant summary judgment accordingly." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990).

The case at bar involves two fundamental disputes concerning the parties' cancellation rights. First, the parties dispute whether, in the course of the lease negotiations, Vittorio and Simon discussed the lease's cancellation scheme or HC & G's desire to modify the lease so that it could "walk away" from the lease for a stipulated damages payment. Second, the parties disagree as to the meaning of the phrase "any cancellation and termination" in Paragraph One of Section 55 of the Modification. HC & G insists the phrase should be read literally to apply to any cancellations or terminations by any party, under any circumstance. Prudential argues that the phrase must be read in the context of the overall lease, in which all cancellation rights belong to the landlord.

Although it is facially unambiguous, I agree with Prudential that the meaning of the phrase "in the event of any cancellation or termination" is uncertain in the context of the overall lease. The Modification nowhere defines cancellation or termination, nor does it explicitly delineate which parties have the ability to end the lease. If the original lease had not included the terms, HC & G might be correct in urging the Court to adopt a sweeping interpretation of the phrase. But

---

2. David E. Mollon, Esq., counsel for HC & G.

the original lease describes narrow lease cancellation and termination rights, held only by Prudential. Prudential's argument that the Modification language merely refers to existing cancellation and termination rights, and creates no new rights for HC & G, is sufficiently plausible to preclude summary judgment. Given the genuine disputes over significant, material facts underlying the meaning of the cancellation and termination language, I deny plaintiff's motion for summary judgment for declaratory judgment as to the meaning of the cancellation provisions of the Modification.

### 3. Partnership Liability Under the Lease

HC & G also seeks a declaratory judgment from the Court as to the meaning of the liability provisions of the lease as modified. Summary judgment is appropriate here, as there is no genuine issue of material fact between the parties.

Plaintiff asserts that the liability scheme provided in the Modification caps both HC & G's liability as a partnership and the aggregate individual liability of HC & G's partners at $1,000,000, with annual reductions thereafter. PM at 8. Prudential maintains that the liability cap applies only to HC & G's individual partners, not to the partnership itself.

The Modification, on its own and in conjunction with the original lease, supports HC & G's interpretation. The Modification clearly distinguishes between the various parties to the agreement, repeatedly referring to "the liability of Partnership Tenant and the partners of Partnership Tenant." Paccione Aff., Exh. D at 1, 2. The substantive provisions of the Modification repeat this distinction, stating, for example, that "the liability of Partnership Tenant shall not exceed One Million Dollars ($1,000,000) (the "Aggregate Liability"). The liability of each of the partners of Partnership Tenant for Aggregate Liability shall be several and limited to" established dollar amounts. *Id.* at 1–2. Additionally, section (iii) of the Modification provides a remedy for Prudential if the individual partners reach their liability caps of $125,000. *Id.* at 3–4. The absence of any reference to the Partnership Tenant in this specific discussion indicates that the Modifi-

cation distinguishes between the two categories and that the term "Partnership Tenant" is not interchangeable with references to the individual partners.

Prudential argues that since the modification negotiations occurred in the context of reducing the existing liability scheme provided in the original lease's Section 55, which it claims governs individual liability and not partnership liability, the Modification cannot be read to cap the liability of HC & G as a partnership. DM at 14–15. Prudential's manager Vittorio testified that

> The focus of the conversations [with Simon] was purely on section 55 and the relief of individual partners' liability as it related to the million dollars in that section. I don't recall any other conversations. There were no other conversations.

Penn Aff., Exh. 6 at 32. When pressed on the matter, he responded as follows:

> Mollon: If you look at the paragraph numbered one ... does that paragraph discuss limitation of liability for the partnership as well as for the individual partners?
>
> Vittorio: As it pertains to section 55, it was my understanding that our discussions were related to the individual partnership liability and—the individual partners' liability. I don't know if "partnership tenant" was a misused term or a misunderstanding, but we only conversed regarding section 55, individual partners' liability.
>
> Mollon: Did you at any time before or after this letter discuss limitation of partnership liability as opposed to individual partnership liability?
>
> Vittorio: No.

Penn Aff., Exh. 6 at 32.

With this argument, Prudential attempts to exploit a potential ambiguity in the meaning of "Partnership Tenant" in Section 55 of the original lease, which reads: "If Tenant is a partnership (or is comprised of two (2) or more partners, individually and as co-partners of a partnership), ... any such partnership and such persons are referred to in this Section as 'Partnership Tenant'...." Paccione Aff., Exh. A, § 55. Yet the original lease avoids any potential confusion by consistently referring to "partners of the Part-

nership Tenant" when describing individual HC & G partners. And not only does the Modification supplant that section, but it clarifies the relevant parties by defining "Partnership Tenant" as "Hertzog, Calamari & Gleason" in its first sentence. Paccione Aff., Exh. D at 1. Vittorio seemed to recognize this distinction in a January 7, 1991 memorandum in which he referred to both "the partnership's liability" and the maximum liability of each "single partner." Paccione Aff., Exh. I at 1.

Fundamentally, Prudential's argument is that the liability provision does not mean what it clearly says, and that the terms in the Modification were misused. But unlike the cancellation and termination language, the term "Partnership Tenant" is clearly defined in both the original lease and the Modification. Both documents consistently distinguish between the partnership of HC & G and the individual HC & G partners. There is nothing unusual, unspoken, or misleading in the references to these parties, nor does the Modification's language contradict the language of the original lease.

 Under New York law, interpretation of a lease is governed by the same rules as are applicable to contract interpretation generally. *George Backer Management Corp. v. Acme Quilting Co., Inc.*, 46 N.Y.2d 211, 413 N.Y.S.2d 135, 138, 385 N.E.2d 1062, 1065–66 (1978); *Fox Paper Ltd. v. Schwarzman*, 168 A.D.2d 604, 563 N.Y.S.2d 439, 441 (1990). Contract language is unambiguous if it has a definite and precise meaning as to which there is no reasonable basis for differing interpretations. *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990). Language whose meaning is otherwise plain is not rendered ambiguous simply because parties dispute its meaning, *id.*, nor should a court interpret language as ambiguous if such an interpretation would "strain the contract language beyond its reasonable and ordinary meaning." *Id.*

Because Prudential's interpretation of the meaning of the terms "Partnership Tenant" and "Partners" strains the lease's language unreasonably, I reject both its explanation of the terms and its assertion that a genuine dispute exists concerning their meaning in the Modification.

I grant summary judgment on this question. I therefore declare that the modified lease between Prudential and HC & G limits the liability of the partnership of Hertzog, Calamari and Gleason to $500,000.00. The lease limits the liability of each of the individual partners of Hertzog, Calamari and Gleason to his or her individual per capita share of $500,000.00, not to exceed $125,000.00 per partner.

### CONCLUSION

Plaintiff's motion for summary judgment is denied as to the cancellation clause of the lease, and granted as to the lease's liability provisions.

There appears to be no demand for a jury. The Court will in the near future arrange a telephone conference call with counsel to schedule an expedited bench trial.

It is SO ORDERED.