**HERTZOG, CALAMARI & GLEASON, Plaintiff,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.**

No. 93 Civ. 6395 (CSH).

United States District Court, S.D. New York.

July 12, 1996.

Hertzog, Calamari & Gleason, New York City (Anthony L. Paccione, Loretta Shaw–Lorello, of counsel), for Plaintiff.

Bachner, Tally, Polevoy & Misher, New York City (H. Richard Penn, Todd Marcus, of counsel), for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

This diversity action arises out of a dispute as to the proper interpretation of a real estate lease between plaintiff law firm, Hertzog, Calamari & Gleason ("HC & G" or "the firm") and defendant Prudential Insurance Company ("Prudential"), the owner and landlord of the property.

HC & G rents space at an office building owned by Prudential and located at 100 Park Avenue, New York City. HC & G's complaint alleges two causes of action. The first is for declaratory relief: specifically, a judicial declaration that, on the proper construction of the lease as modified, the firm is entitled to cancel the lease—that is to say, walk away from it—at any time it chooses, subject only to the payment of a lump sum also set forth in the lease as modified.

HC & G's second cause of action claims damages allegedly arising out of an opportunity the firm lost to rent less expensive space, as the result of Prudential's refusal to accept HC & G's interpretation of the 100 Park Avenue lease.

In a Memorandum Opinion and Order dated March 21, 1996, familiarity with which is presumed, the Court granted in part and denied in part HC & G's motion for summary judgment on its claim for declaratory relief. The case was set down for bench trial on the meaning of the cancellation provisions of the modified lease (first cause of action), and the firm's entitlement to damages if it prevailed on that question of interpretation (second cause of action). Trial was held on May 6, 7,

8 and 13, 1996. Counsel made oral summations. The Court incorporates by reference the factual narration contained in the March 21, 1996 Opinion. That Opinion, together with what follows, constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

## I

On May 16, 1989, HC & G and Prudential entered into a lease whereby HC & G rented space at 100 Park Avenue for 10 years commencing on September 1, 1989. The lease consisted of a three-page printed form and a 19-page typed rider with exhibits. PX 1.

Under the lease as executed on May 16, 1989, only Prudential as landlord had the right to cancel or terminate the lease. It could do so under specified circumstances which it is not presently necessary for me to recount. Typed ¶ 55 of the rider contained provisions for the liability of the individual HC & G partners which I quoted at page 2 of the May 21, 1996 Opinion 933 F.Supp. 246.

By the spring of 1990, HC & G was experiencing economic and professional concerns. Several partners had withdrawn from the firm. Others were indicating that they might do so. The remaining partners were worried about their individual obligations under the lease. HC & G decided to approach Prudential with a view towards obtaining a modification of the lease which might allay the concerns of partners staying on with the firm.

To that end, an HC & G partner named Robert J. Rosen wrote a letter dated May 2, 1990 to Donald Feiner at Cushman and Wakefield, Prudential's agent. Rosen was HC & G's real estate law specialist. He was destined to leave the firm shortly thereafter. But in his letter of May 2, 1990 to Feiner, Rosen undertook to explain the firm's present circumstances. Rosen wrote to Feiner as follows:

Our firm is in the process of undergoing a number of changes, including, but not limited to, a down sizing of our partnership. When the Lease was originally executed, we had a total of 13 partners. Pursuant to Paragraph 55 of the Lease, the maximum

personal liability of each of such partners was approximately $77,000.

With the proposed reduction in the number of partners in the firm, each of the remaining partners may have a substantially increased personal liability with regard to the obligations of the firm under the Lease. While such remaining partners want to continue the operation of Hertzog, Calamari & Gleason and remain in our existing space, they are not willing to do so if their individual liability under the Lease will increase.

We are therefore writing you to request that Prudential consider a modification of the Lease which would provide that the maximum personal liability of any partner in Hertzog, Calamari & Gleason would not exceed either the lesser of $77,000 or the individual partner's per capita share of $1,000,000. We also want you to consider terminating the Lease with regard to the 22nd Floor.

Feiner passed Rosen's letter, without further comment, on to Steve Vittorio, a Prudential employee who managed the affairs of 100 Park Avenue. PX 3.

Conversations between HC & G partners and Prudential representatives did not lead to an immediate agreement. Rosen and Peter E. Calamari, a HC & G name partner, sent a letter to Vittorio dated July 31, 1990, PX 4, which purported to set forth an agreement which the firm believed it had achieved with Prudential. The substantive part of that letter reads:

1. *Section 55 Liability.* The liability of Partnership Tenant shall be reduced by $100,000 for each of the first five consecutive Lease Years of the Lease such that the aggregate partnership liability shall be $500,000 at the end of the fifth Lease Year under said Lease. By way of example, the partnership liability at the end of the second Lease Year shall be $800,000. For the purposes hereof, the term "Lease Year" shall mean a fiscal year commencing on September 1 and ending on August 31, with the first such Lease Year commencing on September 1, 1989.

2. Except as otherwise amended hereby, all terms of the Lease shall remain in full force and effect.

The letter contained a signature line by which Prudential would indicate its agreement. But it does not appear that Prudential ever did so.

Rosen having left HC & G, the lease modification negotiations became the responsibility of William Simon, another HC & G partner. Simon had a number of telephone conversations with Vittorio. The fact that conversations occurred is not disputed; their content is.

HC & G submitted as PX 5 a "Memorandum For Files" dictated by Simon and dated September 5, 1990. That memorandum refers to two telephone conversations that he had with Vittorio on August 29, 1990. The memorandum recites that Simon called Vittorio to ask him if there was any difficulty regarding the proposed lease modification set forth in the letter from Calamari and Rosen dated July 31, 1990. The Simon memorandum then goes on to say of Vittorio:

He indicated that the agreement was acceptable and that he did not intend to back away from our deal, but also indicated that, after consultation with his counsel, both he and his counsel thought that the personal liability provision was not entirely clear.

I told him that, in my view, the provision was crystal clear in that it allowed the firm and all of its partners to merely walk away from the lease by paying the penalty with no further liability. He agreed with my interpretation and indicated that his problem was not with that aspect of the clause, but rather with the number of partners who might ultimately be responsible. His fear and the fear expressed by his counsel was that the number of responsible partners could theoretically dwindle to one or two, thus leaving Prudential without realistic recourse. I agreed with him that theoretically that result was possible, but told him I would consult with my partners since I did not believe such a result was intended. I told him that I would then attempt to draft some new language to address his concerns.

In his trial testimony, Vittorio denied that during his conversations with Simon, any reference was made by Simon to the HC & G partners' purported ability "to merely walk away from the lease by paying the penalty with no further liability." Simon, in his testimony, said that his September 5, 1990 memorandum for files accurately reflected his conversations with Vittorio.

It is, however, common ground that as an enclosure to a letter dated October 1, 1990, Simon sent to Vittorio a proposed modification to the lease which Simon had drafted. Vittorio, his superiors, and house counsel for Prudential examined the document and requested that two changes be made in the wording of the first paragraph, to which HC & G agreed. Thereafter, the parties entered into a typed modification of the May 16, 1989 lease, the modification being dated May 6, 1991. The case turns upon the proper interpretation of ¶ 1 and 2 of the modification, quoted in the Opinion dated March 21, 1996 at 248–249.

HC & G focuses upon the introductory phrases that appear in ¶ 1 of the May 6, 1991 lease modification:

Notwithstanding any provision of the Lease to the contrary, in the event of any cancellation or termination of the Lease, the liability of Partnership tenant and the partners of Partnership tenant under the Lease shall be set forth below: ...

Nowhere in this language, or in the rest of the modification agreement, can one find an explicit provision that the firm could "walk away from the lease." But HC & G argues that the reference to "*any* cancellation or termination of the Lease" unmistakably and necessarily conveys that meaning.

Prudential says that nothing in the modification or the lease which it modified grants the firm as tenant the right to walk away from the lease.

Predictably enough, each side characterizes the other's interpretation as economically senseless. Calamari testified that, given the firm's economic and professional circumstances, it would make no sense for the firm to agree to a lease modification under which

only Prudential could cancel or terminate the lease. Vittorio, testifying for Prudential, said that in a depressed office rental market in which the HC & G lease exceeded the then prevailing market rate, it would make no sense for Prudential to give HC & G the right to walk away from the lease, thereby diminishing the cash flow generated by the building and its value to Prudential.

In the Opinion dated March 21, 1996, at 252, I said that while the phrase "any cancellation or termination of the lease" might be "facially unambiguous," its meaning was "uncertain in the context of the overall lease." The trial addressed that issue and also delved into the words and conduct of the parties leading up to execution of the lease modification on May 6, 1991.

## II

HC & G, seeking a judicial declaration that the modified lease should be read as it reads it, bears the burden of proof on the issue. Specifically, HC & G bears the burden of proving that Prudential comprehended and agreed to the firm's ability to walk away from the lease upon payment of the fixed liability set forth in the succeeding paragraphs of the modification.

For the reasons that follow, I conclude that HC & G has failed to sustain that burden of proof.

■ Preliminarily, I reject Prudential's contention that the maxim contra proferentem should be applied against HC & G on the ground that Simon drafted the lease modification. Construing language strictly against the draftsman is appropriate when one party is in a position to dictate the terms of an agreement to the other. Policies of insurance constitute a classic example. *See, e.g., Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 1000 (2d Cir.1974) ("Contra proferentem has special relevance as a rule of construction when an insurer fails to use apt words to exclude a known risk."). The more recent Second Circuit case Prudential relies upon, *United States Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044 (2d Cir.1989), is of like character. The contract involved was the "standard form paperback license" drafted by the defendant publisher, to which the plaintiff had agreed. Plaintiff, in the words of the Court of Appeals, was "a small specialized publisher of books of naval interest"; "few, if any, of its books had mass-market distribution. It had no experience in the publication of bestsellers." 875 F.2d at 1045. In those circumstances, the Court of Appeals said at 1050:

> Finally, if, after all of the other guides to interpretation have been exhausted and the court concludes that there remain two reasonable interpretations of the contract, with each party knowing or having reason to know of the other party's understanding of the term, the court should as a policy matter, assuming it is clear that the parties have indeed attempted to enter into a contract, choose the interpretation that is adverse to the party that drafted the contract.

For that proposition, the Second Circuit in *Charter* cited two New York cases: *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975), and *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 348, 126 N.E.2d 271 (1955). In *67 Wall Street,* the Court of Appeals said that the trial court "properly referred to the rule that in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it and favorably to a party *who had no voice in the selection of its language.*" (emphasis added). In *Rentways,* the Court of Appeals said that application of the contra proferentem principle "is particularly appropriate in this case, where the contract was embodied in a printed form prepared specifically by plaintiff for its use . . . ."

In the case at bar, it cannot be said that Prudential "had no choice in the selection" of the lease modification's language. At the very least, the parties were in parity with each other; it is arguable that Prudential as landlord held the stronger hand. Prudential had available to it experienced real estate managers and squads, if not platoons, of in-house and outside counsel to advise it on the language HC & G proposed. Prudential felt no inhibition in requesting that the language

be changed; the firm agreed to the two such requests that Prudential made. Those changes are not material to the present issues. But they show that HC & G could not dictate the language of the modification. This is not a contract of adhesion. In the circumstances of this case, the contra proferentem maxim has no proper office to perform.

## III

■ A proper analysis begins with HC & G's first request for a lease modification, as revealed by the trial record. That request took the form of Rosen's May 2, 1990 letter to Feiner at Cushman & Wakefield. I quoted that letter at pages 248–249, *supra*. The only concern Rosen expressed to Feiner was a limitation of the individual partners' per capita liability under the lease. This initial request by the firm contains no explicit reference to a modification permitting the firm to terminate the lease at its option; nor do I think that the subject may fairly be implied from the Rosen letter.

Thus it is not surprising that the ensuing negotiations focused upon the liability of the individual partners. We know that is so from the text of HC & G's July 31, 1990 letter to Vittorio, signed by Calamari and Rosen, quoted at page 249, *supra*. The proposed modification is captioned "Section 55 Liability." Section 55, quoted in part in the March 21, 1996 opinion at 248, forms a part of the typed rider to the May 16, 1989 lease, and focuses upon the individual liabilities of the firm's partners. Consistent with the caption preceding the operative paragraph in the July 31, 1990 proposed modification, that is the only subject discussed.

Entirely consistent with this limited concept of lease modification, Vittorio sent a memorandum dated January 7, 1991 to his superior at Prudential, Sharon Barnes, in which Vittorio undertook to explain the reason for the requested modification and its effect if granted. PX 7. Vittorio begins by describing the departure from the firm of a number of senior partners, and then advises Barnes as follows:

> With a $1,000,000 guarantee of the lease as security, the departure of several partners

is causing a greater amount of liability to be spread among younger, less financially endowed partners. These attorneys are prepared to abandon the firm due to this situation. This could cause the firm to cease existence and we would be faced with the undesirable position of having to file suit against numerous individuals. We would also increase the vacancy at 100 Park.

> As part of a plan to hold the firm together, Bill Simon of Hertzog, Calamari & Gleason requested that Prudential substantially reduce the partnership's liability. We compromised by settling at a reduction of liability of $100,000 per year for the first five years with the remaining $500,000 liability continuing through the expiration of the lease. We will also provide that no single partner will be responsible for more than $125,000.

> This arrangement only marginally effects our security because a lease default, subsequent judgment and collection of award would most likely result in a net amount less than the $500,000 limit proposed.

Vittorio attached to his memorandum a copy of the proposed lease modification forwarded to him by Simon on October 1, 1990. PX 6. Vittorio asked for instructions as to whether Prudential would agree to the modification.

Vittorio responded to Simon in a letter with a typed date of February 27, 1991 and a handwritten date of March 7, 1991. Prudential was prepared to accept the modification, with the two changes in the wording of ¶ 1 to which HC & G agreed. The lease modification agreement, in the form appearing as PX 2, was thereupon executed by both parties.

Thus, to the extent that the contemporaneous documents exchanged between the parties tell the tale, the concerns expressed by the remaining HC & G partners related only to a diminution of their individual liabilities under the lease. One searches through these documents in vain for any explicit reference to the firm's desire for, or accomplishment of, a lease modification entitling the firm to walk away from the lease at any time of its choosing.

Surely Vittorio's January 7, 1991 memorandum to Sharon Barnes is devoid of any indication that Vittorio understood the firm was pursuing a walk away option. Vittorio speaks only of the remaining partners' concerns about their personal liability. Vittorio expresses his concern to Barnes that circumstances might arise where "we would also increase the vacancy at 100 Park;" but that concern is expressed only in the context of the remaining partners "abandon[ing] the firm due to this situation," which "would cause the firm to cease existence. . . ." That is the only circumstance envisioned by Vittorio in his January 7, 1991 memorandum that would increase the vacancy rate at the building. But the vacancy rate would also be subject to potential increase if the firm obtained the right to walk away from the lease. It is inconceivable that, if that proposition was being put to Vittorio, he would not have called it to the attention of Barnes. The conclusion I draw from Vittorio's January 7, 1991 memorandum is that it fully reflects his understanding of what HC & G was seeking to obtain in the lease modification; and that understanding does not extend to a walk away provision in favor of the firm.

## IV

Thus far I have considered only the documents exchanged between the parties, together with Vittorio's internal memorandum to Barnes. But there is also Simon's September 5, 1990 internal memorandum, antedating the Vittorio internal memorandum by four months, in which Simon says that Vittorio had agreed to an interpretation of the modification which would allow "the firm and all of its partners to merely walk away from the lease." As noted, Simon testified that Vittorio expressed that agreement in telephone conversations with him. Vittorio testified that he never did so.

■ Simon's memorandum is not binding on Prudential. The testimony of Simon and Vittorio cannot be reconciled. In deciding which of two diametrically opposed accounts to accept, the factfinder uses certain tools: the demeanor of the witnesses; whether they are interested in the outcome; the inherent plausibility or implausibility of what they say;

and the extent to which the competing accounts may be corroborated or not corroborated by independent evidence.

Both Simon and Vittorio appeared to testify forthrightly. Both are interested in the outcome of the litigation. These factors are in balance and do not assist me.

But the contemporaneous exchanges of documents between the parties, together with Vittorio's internal memorandum of January 7, 1991, corroborate Vittorio's trial testimony that a tenant's walk away option was neither discussed nor agreed to. That is because HC & G's expressed concerns were not phrased in that fashion; and there is no explicit reference to the firm's right to walk away.

I also think it is inherently implausible to suggest that a commercial landlord, holding a long-term lease at a rate higher than that available in a depressed rental market, would bestow upon its tenant the right to walk away from the lease upon payment of a lump sum significantly less than the rent owing under the lease.

Conversely, it is not inherently implausible that HC & G would consider and accept a lease modification falling short of conferring the ability to walk away from the lease. In point of fact, the remaining partners of HC & G achieved significant relief from the lease modification as construed by Prudential: a diminution of their potential personal liability, and the provision that Prudential could look to partners who left the firm after execution of the modification, if that was necessary to give additional economic assistance to the partners who remained.

In these circumstances, I find myself unable to accept Simon's testimony on the point, or the account given in his September 5, 1990 memorandum for the files. I think it important to say, in that regard, that I perceive nothing more at work here than the tendency, inherent in that human estate we all share, to see what we wish to see, and hear what we wish to hear.

## V

■ Under New York law, "options to terminate tenures granted by the provisions of a contract or a lease should be strictly con-

strued." *Greenwich Village Associates v. Salle,* 110 A.D.2d 111, 493 N.Y.S.2d 461, 462 (1st Dept.1985). *Salle* arose in the perhaps more common context of a landlord seeking to terminate a tenant's lease; but no principled reason exists for applying a different construction where, as here, the tenant is seeking to terminate, particularly where both parties are sophisticated entities.

Thus HC & G faces a heightened burden of proving that the lease modification reflects Prudential's comprehension that the modification conferred upon HC & G an option to terminate, and that Prudential agreed to such a modification. On the evidence adduced at trial, I conclude that HC & G has not sustained that burden. The particular phrases in ¶ 1 of the modification upon which the firm relies constitute too fragile a vessel to carry that heavy a cargo of contract construction.

That is particularly so, since it is so easy to draft language giving a tenant the right to terminate a lease, if that is really the parties' understanding and intent. Indeed, that truism is illustrated by an earlier communication from Rosen, then an HC & G partner, to Prudential dated April 26, 1989. Rosen forwarded proposed language to the lease which said:

> In the event that landlord fails to deliver possession of (i) Suite 2201 prior to August 1, 1990, (ii) Suite 2201 prior to May 1, 1996, or (iii) Suite 2203 prior to October 1, 1990, the Tenant shall have the option to terminate this Lease upon ninety (90) days written notice to Landlord.

Whether or not Prudential agreed to that language proposed by Rosen is not material. Its significance lies in the ease with which a termination option in favor of a tenant may be drafted. Thus it becomes all the more difficult for HC & G to argue that Prudential should have placed such an interpretation upon the language contained in the lease modification with which this litigation is concerned.

When one reads the May 16, 1989 lease and the May 6, 1991 modification together, it becomes apparent that HC & G's interpretation of the modification brings about a fundamental change in the lease: conferring upon the tenant an option to terminate, whereas previously only the landlord could terminate or cancel the lease. On Prudential's interpretation, the modification furnishes a greater measure of economic relief to the remaining partners of the firm, but works no fundamental change upon the balance of the landlord-tenant relationship. It is easy enough to imagine language which might have supported HC & G's interpretation, but one does not find it in the lease modification. I conclude that HC & G has failed to sustain its burden of proving that the construction for which it contends is the proper one.

It necessarily follows that HC & G has no viable claim for damages, as alleged in the second cause of action.

The Clerk of the Court is directed to enter judgment in favor of defendant Prudential Insurance Company of America, and against plaintiff Hertzog, Calamari & Gleason, dismissing the complaint in its entirety, with costs in favor of defendant in an amount to be taxed by the Clerk.

It is SO ORDERED.