**ATLANTIC RICHFIELD COMPANY and Arco Aluminum, Inc., Plaintiffs,**

v.

**ALCAN ALUMINUM HOLDINGS LIMITED and Alcan Aluminum Corp., Defendants.**

No. 96 Civ. 3956 (LLS).

United States District Court,
S.D. New York.

Aug. 31, 1998.

Arnold & Porter, New York City, for Plaintiffs; Bruce R. Kelly, William H. Voth, Jeffrey G. Cross, Roger P. Frendrich, Washington, DC, of counsel.

Jones, Day, Reavis & Pogue, Cleveland, OH, for Defendants; Richard B. Whitney, Mary Jordan Hughes, Mark A. Whitt, J. Kevin Cogan, Columbus, OH, of counsel.

## MEMORANDUM and ORDER

STANTON, District Judge.

The issue is whether there is a justiciable case or controversy.

So far as relevant here, this is an action for a declaratory judgment granting plaintiffs ("ARCO") the right under section 7.3 of their Restructuring Agreement with the defendants ("Alcan") to change ARCO's production mix in a way which would increase its use of the hot mill capacity at the parties' Logan, Kentucky plant, thus reducing the amount of hot mill hours available to Alcan.

Plaintiffs' trial brief on that issue stated (May 22, 1998 Pretrial Memo p. 7):

> While ARCO Aluminum's management has not yet decided whether to shift the company's product mix away from can sheet, it wants to assure its ability to do so if economic analysis shows that it would be the most profitable course.

On the first day of the bench trial, ARCO's Vice President for Finance, Planning and Control accepted that as a fair statement of the present situation (tr. 105). He testified (tr. 105–07):

> THE COURT: Mr. Hayden, I have a question or two for you if I may, after which I will allow counsel to ask any further questions stimulated by mine.
>
> There is a statement in the brief recently filed on Arco's behalf which I am going to read to you and then ask you if it's an accurate statement of the state of affairs at present: "While Arco Aluminum's management has not yet decided whether to shift the company's product mix away from can sheet, it wants to assure its ability to do so if economic analysis shows that it would be the most profitable course."
>
> Is that a fair statement of the present situation?
>
> THE WITNESS: Yes, it is.
>
> THE COURT: What economic studies would be required in order to allow that decision to be made?
>
> \*   \*   \*   \*   \*   \*
>
> THE WITNESS: I think the discussions that we had, preliminary discussions with the companies that we were talking about, we need to continue to see if we could do those in the volume and the length of contract, and also that the pricing, which we saw was obtainable on the smaller quantities, whether we could

obtain that pricing for larger quantities, and, also, we would have to make some capital expansions in certain areas in the preheat and melt and cast to significantly take advantage of this full opportunity. So we would need to evaluate what the capital costs are, what the additional revenue that we would expect to generate from this process would be.

THE COURT: How long would that process take?

\* \* \* \* \* \*

THE WITNESS: Well, I'm not sure that you could put a time frame. Possibly six months once we were sure that we had the right to enter into these long-term contracts.

THE COURT: So after you were sure that you had the right, it would take you about six months to decide whether or not to exercise that right?

THE WITNESS: That would be my guess, yes.

Since it appeared that there might be no actual case or controversy until after ARCO had evaluated the volume and length of contracts available, the pricing obtainable at various quantity levels, the capital costs of necessary expansions in certain production areas and the additional revenue expected to be generated, the trial was thereupon adjourned to allow briefing of the point.

ARCO argues that in cases such as *American Mach. & Metals, Inc. v. De Bothezat Impeller Co.*, 166 F.2d 535 (2d Cir.1948) declaratory judgment was allowed although the party's actions would depend upon what the court decided. In those cases the party's intention and desire were already formed; but it could not act on its intention without the immediate prospect of incurring damages ("Once the notice of termination is given, it is beyond recall": *De Bothezat*, 166 F.2d at 536). Thus, in each of *Hertzog, Calamari & Gleason v. Prudential Insurance Co.*, 933 F.Supp. 246 (S.D.N.Y.1996) and *Gilbert, Segall & Young v. Bank of Montreal*, 785 F.Supp. 453 (S.D.N.Y.1992) without a declaratory judgment the tenant would have to break its lease and move out, risking large damages. That is not true here.

ARCO does not know whether it will wish to exercise the right for which it sues. In order to decide, it needs at least to test the market, weigh the investment involved, and obtain its parent's approval. There is evidence of a division of opinion within ARCO itself about the desirability of the proposed change: *see* Joint Ex. 121, annexed as Ex. 5 to July 1, 1998 of Hayden Decl. As far as any persuasive reason appears, it is feasible for ARCO to resolve all those issues \* without committing itself to an irrevocable course of action which would breach the Restructuring Agreement and expose it to damages.

Under the evidence, the court's opinion would be merely advisory. There is no present "actual controversy" as required by 28 U.S.C. § 2201, and the complaint is dismissed for lack of jurisdiction.

Counsel are invited to attend a conference on Wednesday, September 16, 1998 at 11:30 a.m. in Room 21C, or such adjourned date as may be more convenient, to discuss the counterclaim which was bifurcated on consent by this court's January 23, 1998 order.

---

\* ARCO's "sales and marketing staff talk to customers every day" (Declaration of Richard Hayden ("Hayden Decl.") ¶ 31); its customers demand long-term commitments in substantial volumes, and usually ARCO knows who the buyer is before it manufactures the product (*Id.* at ¶ 11).